United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 07, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-90020** |
| **SERTA SIMMONS BEDDING, LLC,** | § | |
| *et al.*, | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | |
| | § | |
| **SERTA SIMMONS BEDDING LLC** | § | |
| *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **ADVERSARY NO. 23-09001** |
| | § | |
| **AG CENTRE STREET** | § | |
| **PARTNERSHIP,** *et al.*, | § | |
| | § | |
| Defendants. | | |

### <u>MEMORANDUM OPINION</u>

In June 2020, Serta Simmons Bedding, LLC and certain of its affiliates ("**Serta**") executed a liability management transaction with a subset of first lien lenders. The transaction was structured as an "open market purchase" under the relevant credit agreement to avoid triggering pro rata treatment with other first lien lenders. The Fifth Circuit ultimately held the transaction was not a permissible "open market purchase" and remanded the case to this Court. The question on remand is whether the lenders who participated in the liability management transaction—the Defendants—breached the credit agreement by receiving payments on their first-lien debt without purchasing participations in the loans held by the excluded first lien lenders—who are the Plaintiffs. The answer to this question is yes. Judgment is for the Plaintiffs.

## Background[1]

In November 2016, Serta borrowed $1.95 billion under a First Lien Term Loan Agreement (the "**Credit Agreement**"). The Credit Agreement included a "sacred right" of pro rata sharing. Ratable treatment required loan payments to be proportionally allocated between lenders according to their share of outstanding debt.[2] Under that provision, lenders who received excess payments had to pay down loans held by other lenders in the same class to ensure equal treatment. Section 2.18(c) states the operative trigger and remedy:

> If any Lender obtains payment . . . in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class.[3]

The Credit Agreement carved out some express exceptions to pro rata sharing, including an "open market purchase."[4]

### a.    Serta's Financial Distress: Seeds of the 2020 Transaction

By 2019, Serta carried over $2 billion in secured debt. Its largest retail partner restructured, direct-to-consumer bedding companies were gaining market share, and COVID-19 forced more than half of Serta's manufacturing facilities to close. Serta needed to reduce its debt and raise new capital.

---

[1] This Adversary Proceeding (Adv. Pro. No. 23-09001) was initiated in connection with Main Case No. 23-90020. Certain citations refer to ECF numbers in the Main Case. Other citations refer to ECF numbers in this Adversary Proceeding. The parties' stipulation at Adv. ECF No. 637 lists documents admitted by agreement for this trial, which includes all documents admitted in an earlier 2023 trial. *See also* Adv. ECF No. 729 (Joint List of Admitted Exhibits). This Court has jurisdiction under 28 U.S.C. § 1334. *See also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683–85 (2015).

[2] *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 557 (5th Cir. 2024), *as revised* (Jan. 21, 2025), as revised (Feb. 14, 2025).

[3] Credit Agreement § 2.18(c), Debtors' Ex. 6, Case No. 23-90020, ECF No. 853-6.

[4] Credit Agreement § 9.05(g), Debtors' Ex. 6, Case No. 23-90020, ECF No. 853-6.

Serta hired Evercore Partners, Inc. to evaluate liquidity and liability management solutions.[5] Serta's parent also established an independent finance committee to oversee discussions with stakeholders about a potential restructuring transaction. The committee's objective was to raise new capital, reduce net debt, and capture the discount at which Serta's loans were trading in the secondary market. The committee had full authority to authorize Serta to enter into a refinancing transaction.[6]

*The First Proposal (Excluded Lenders)*

The first proposal came from a group that would later become part of the Excluded Lenders.[7] In early January 2020, Angelo Gordon internally designed a drop-down transaction to de-lever Serta.[8] Under the drop-down structure, Serta would transfer intellectual property to a new unrestricted subsidiary. Angelo Gordon or an ad hoc group would then advance new money secured by those assets in exchange for a discount on existing debt. The new-money debt would rank structurally senior to all other Serta obligations.[9] Angelo Gordon sent the initial drop-down proposal to Serta around March 3, 2020.[10]

Apollo Global Management and Gamut Capital Management pursued similar strategies. Apollo was an original lender who exited its position in 2018. It viewed Serta's first-lien debt as a "distressed-for-control" opportunity.[11] Apollo started re-purchasing Serta debt in March 2020.[12] Gamut had been accumulating Serta debt since December 2018, acquiring $163 million at an average cost of about 58 cents on the dollar.[13]

Angelo Gordon eventually joined with Apollo and Gamut and negotiated proposals with Serta professionals. The group's final proposal to Serta was around May 30, 2020.[14] The proposal consisted of a drop down transaction, along with $200 million in new money, an exchange of $483 million of first-lien debt at 77.5% of par

---

[5] March 5, 2026 Tr. 12:7–16 (Shah), Adv. ECF No. 717.

[6] Debtor Ex. 51, Adv. ECF No. 861-45.

[7] Excluded lenders is a term that generally refers to parties who did not participate in a liability management transaction with a company. Lenders who did participate in such a transaction are sometimes called the participating lenders or majority lenders. Sometimes excluded lenders are participating lenders in other deals, and vice versa.

[8] March 3, 2026 Tr. 154:4–55:4; *see also* Debtors' Ex. 304, Case No. 23-90020, ECF No. 866-37 at 2.

[9] Debtors' Ex. 8, Case No. 23-90020, ECF No. 861-3 at 22–24.

[10] March 5, 2026 Tr. 16:22–17:7; 19:13–16 (Shah), Adv. ECF No. 717; March 3, 2026 Tr. 157:19–21 (Gladstone), Adv. ECF No. 677.

[11] Debtors' Ex. 15, Case No. 23-90020, ECF No. 861-9 at 2.

[12] Debtors' Ex. 43, Case No. 23-90020, ECF No. 861-37 at 1.

[13] Debtors' Ex. 305, Case No. 23-90020 ECF No. 866-38 at 2.

[14] March 3, 2026 Tr. 34:20–35 (Kwon), Adv. ECF No. 677; Debtors' Ex. 202, Case No. 23-90020, ECF No. 864-45.

and $41 million of second-lien debt at 30% of par—generating $387 million of a new structurally senior debt.[15]

*The Participating Lenders' Counter Proposals*

The second group—which would become the "Participating Lenders"—initially consisted of Eaton Vance, Invesco Senior Secured Management, Inc., Credit Suisse Asset Management, and Barings LLC.[16] These lenders were broadly syndicated loan funds that purchased the loans at or near par at origination in 2016.[17]

On April 7, 2020, the Participating Lenders contacted Serta to discuss liquidity needs and followed up on April 24 with the outline of an "uptier" transaction open to all first and second-lien lenders.[18] The structure involved Participating Lenders (i) providing Serta $200 million in new financing in exchange for $200 million in first-out super-priority debt, and (ii) exchanging $1.2 billion in existing first and second-lien loans for about $875 million in second-out super-priority debt.[19]

In early May 2020, as the Participating Lenders started negotiating with Serta under a nondisclosure agreement ("**NDA**"), Serta looked to "monetize a discount on the loans, to take advantage of where the debt was trading."[20] The Participating Lenders also learned that other lenders had proposed a non-pro rata transaction involving Serta's intellectual property.[21] Serta's process resulted in the lender groups competing against each other to extract the maximum discount.[22]

In late May 2020, while both groups were under NDAs with Serta, Eaton Vance contacted Apollo to try to stop what was described as a "race to the bottom" on discount and to explore working together as a unified creditor group.[23] Apollo did not engage substantively because it understood the NDAs to preclude any meaningful discussion about the parties' competing negotiations with the company.[24]

---

[15] Debtors' Ex. 202, Case No. 23-90020, ECF No. 864-45.

[16] March 4, 2026 Tr. 157:20–158:15 (Searles), Adv. ECF No. 676.

[17] March 4, 2026 Tr. 123:10–16 (Yarrow), Adv. ECF No. 676 (Invesco-managed funds purchased First Lien Term Loans in 2016 "shortly after origination").

[18] March 4, 2026 Tr. 16:10–19:25 (Daniello), Adv. ECF No. 676.

[19] *Serta*, 125 F.4th at 569, *as revised* (Jan. 21, 2025), *as revised* (Feb. 14, 2025).

[20] March 4, 2026 Tr. 20:7–21 (Daniello), Adv. ECF No. 676.

[21] March 4, 2026 Tr. 21:6–22:17 (Daniello), Adv. ECF No. 676.

[22] March 3, 2026 Tr. 18:1–18 (Kwon), Adv. ECF No. 677.

[23] March 4, 2026 Tr. 24:22–26:25, 65:13–67:19 (Daniello), Adv. ECF No. 676 (Eaton Vance reached out to Apollo to suggest that the groups "stop this race to the bottom" and work together because "the company [was] doing a good job of . . . pitting us against each other").

[24] March 3, 2026 Tr. 27:9–19 (Kwon), Adv. ECF No. 677.

According to an Eaton Vance representative, Serta had "all of the negotiating leverage" because it was talking to multiple groups under NDAs, the credit documents were "loose," and the debt was trading well below par.[25] The discount was "probably [Serta's] single most negotiated item."[26] The Participating Lenders were reluctant to provide any discount at all because they had largely purchased their debt at par, making the concession a permanent cap on recovery.[27] They felt the drop-down proposal was a defensive response to a transaction they did not want.[28] In late May/early June, 2020, the Participating Lenders submitted a revised proposal combining $200 million in new-money priority financing with a discounted debt repurchase.[29] On June 5, 2020, Serta's finance committee accepted this deal.[30]

Separately, a group of related companies holding first-lien term loans known here as the "**LCM Lenders**"[31] never participated in any negotiations with Serta or Evercore about a liability management transaction.

### The 2020 Transaction Between Serta and the Participating Lenders

On June 8, 2020, Serta issued a press release announcing that it entered an agreement with the Participating Lenders for a "deleveraging and liquidity enhancing transaction."[32] The press release described the primary terms of the uptier liability management transaction that will be referred to here as the "**2020 Transaction**."

Upon the announcement of the 2020 Transaction, the indicated pricing of the First Lien Term Loan dropped by about 25%.[33] Moody's downgraded Serta's first-lien and second-lien term loans, observing that "term loan lenders who do not consent to the transaction will potentially be left with little or no remaining collateral coverage."[34] Certain Excluded Lenders offered the Participating Lenders $30 million to stop the 2020 Transaction, but it was rejected.[35]

---

[25] March 4, 2026 Tr. 28:11–29:3 (Daniello), Adv. ECF No. 676.

[26] March 4, 2026 Tr. 23:7–9 (Daniello), Adv. ECF No. 676.

[27] March 4, 2026 Tr. 31:7–32:19 (Daniello), Adv. ECF No. 676.

[28] March 4, 2026 Tr. 113:19-114:4 (Daniello), Adv. ECF No. 676.

[29] Debtors' Ex. 202, Case No. 23-90020, ECF No. 864-45.

[30] Debtors' Ex. 202, Case No. 23-90020, ECF No. 864-45.

[31] LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd., LCM 28 Ltd., LCM XIII Limited Partnership, LCM XIV Limited Partnership, LCM XV Limited Partnership, LCM XVI Limited Partnership, LCM XVII Limited Partnership, LCM XVIII Limited Partnership, LCM XIX Limited Partnership, LCM XX Limited Partnership, and LCM XXI Limited Partnership.

[32] PTL Ex. 140, Adv. ECF No. 579-6.

[33] DX0686, Adv. ECF No. 585-14.

[34] DX1244, Adv. ECF No. 588-63 at 3–8.

[35] *See* Debtors' Ex. 212, Case No. 23-90020, ECF No. 865-5.

### b.　Litigation to Stop the 2020 Transaction

In June 2020, certain Excluded Lenders filed a lawsuit in a New York state court seeking a temporary restraining order and preliminary injunction to block the 2020 Transaction. They also asserted claims for breach of the implied covenant of good faith and fair dealing.[36]

One of these lender/plaintiffs was an LCM Lender related entity.[37] It did so because it viewed the 2020 Transaction as an existential threat to its business, and the broader market for senior secured lending as a whole.[38]

The state court ultimately denied the preliminary injunction request.[39] The plaintiffs voluntarily withdrew their claims, and LCM's collateral manager withdrew its intervention request and voluntarily discontinued its separate action without prejudice.[40]

### c.　The 2020 Transaction Closes

The 2020 Transaction closed on June 22, 2020. To effect the 2020 Transaction, Serta and Participating Lenders holding more than 50% of the outstanding loans amended the Credit Agreement to allow Serta to, among other things:

- Incur incremental debt senior in right of payment to the First Lien Term Loans,[41] and
- Authorize the Administrative Agent to enter into a separate intercreditor agreement to establish senior payment priority for these new loans.[42]

With these changes in place, Serta and the Participating Lenders also entered into the following agreements:

- Super-Priority Term Loan Agreement ("**PTL Credit Agreement**");[43]
- Open Market Purchase and Cashless Exchange Agreement ("**Exchange Agreement**");[44] and

---

[36] *See N. Star Debt Holdings L.P. v. Serta Simmons Bedding LLC*, No. 652243/2020, NYSCEF 1 (N.Y. Sup. Ct. June 11, 2020).

[37] *See North Star*, No. 652243/2020, NYSCEF 57-61 (N.Y. Sup. Ct. June 18, 2020); *LCM Asset Mgmt. LLC v. Serta Simmons Bedding, LLC*, No. 652555/2020, NYSCEF 1 (N.Y. Sup. Ct. June 18, 2020).

[38] March 3, 2026 Tr. 273:21–275:16 (Tavangar), Adv. ECF No. 677.

[39] *See North Star*, No. 652243/2020, 2020 WL 3411267, at *6 (N.Y. Sup. Ct. June 19, 2020).

[40] *North Star*, No. 652243/2020, NYSCEF 124 (July 2, 2020); *LCM Asset Mgmt.*, No. 652555/2020, NYSCEF 14 (July 2, 2020).

[41] First Amendment to the Credit Agreement at 38, Debtors' Ex. 250, Case No. 23-90020, ECF No. 857-99.

[42] First Amendment to the Credit Agreement §8.08, Debtors' Ex. 250, Case No. 23-90020, ECF No. 857-99.

[43] PTL Credit Agreement, Case No. 23-90020, ECF 865-42.

[44] Exchange Agreement, DX0547, Adv. ECF No. 581-66.

- First Lien Intercreditor Agreement.[45]

Under the PTL Credit Agreement, Serta incurred $1.075 billion of new debt in two tranches: a $200 million new-money tranche of "first-lien first-out" loans and an $875 million exchange tranche of "first-lien second-out" loans. The PTL Credit Agreement also carried a provision from the Credit Agreement requiring Serta to indemnify the Participating Lenders for losses, claims, and damages arising from the 2020 Transaction.[46] And to avoid triggering the sacred right of ratable treatment and payment under § 2.18(c) of the Credit Agreement, the 2020 Transaction was structured as an "open market purchase" under § 9.05(g).

The Exchange Agreement recitals said that § 2.18(c) would not apply to payments made as consideration for the assignment of existing First Lien Term Loans or Second Lien Term Loan under § 9.05(g).[47] Participating Lenders also agreed to "sell, assign, and transfer" their "Purchased First Lien Term Loans" to Serta affiliates.[48] As consideration, Serta gave the Participating Lenders First Lien Second Out Debt equal to 74.0% of the Participating Lenders' "Purchased First Lien Loans."[49] Serta then retired and cancelled the loans it received—recording it under § 9.05(g).[50] Not all Participating Lenders provided new money. But all of them participated in the uptier debt exchange.[51]

The new debt carried materially different terms. The $1.075 billion of super-priority debt matured about three months ahead of the original first-lien term loans' scheduled maturity.[52] The second-out loans bore interest at LIBOR plus 7.50%, which is more than double the rate on the first-lien term loans.[53] The higher rate would compensate the Participating Lenders for the 26-cent haircut on the face value of their exchanged debt.

The PTL Credit Agreement also created an open-ended basket for future exchanges of first-lien and second-lien term loans into a "third-out" tranche. Third-out debt would rank senior to the legacy first-lien term loans held by the Excluded Lenders the LCM Lenders. A new intercreditor agreement established a three-tier waterfall: first-out, then second-out, and then the legacy first-lien term loans.[54]

---

[45] First Lien Intercreditor Agreement, Debtors' Ex. 254, Case No. 23-90020, ECF No. 865-44.

[46] PTL Credit Agreement at 2, Case No. 23-90020, ECF No. 865-42.

[47] Exchange Agreement, DX0547, Adv. ECF No. 581-66.

[48] Exchange Agreement § 2.1, DX0547, Adv. ECF No. 581-66.

[49] Exchange Agreement § 2.1, DX0547, Adv. ECF No. 581-66. Each signature page included the amount of First Lien Term Loans a Participating Lender sold, assigned, and transferred to Serta for First Lien Second Out Debt. Exchange Agreement, DX0547, Adv. ECF No. 581-66 (signature pages).

[50] Exchange Agreement § 2.1(d), DX0547, Adv. ECF No. 581-66.

[51] Excluded Lenders' Pre-Trial Brief, pp. 17-18, Case No. 23-09001, Adv. ECF No. 570 at 17–18.

[52] PTL Credit Agreement, Case No. 23-90020, ECF No. 865-42.

[53] Credit Agreement at 4, Debtors' Ex. 6, Case No. 23-90020, ECF No. 853-6.

[54] First Lien Intercreditor Agreement § 2.01(a), Debtors' Ex. 254, Case No. 23-90020, ECF No. 865-44.

In the end, the Participating Lenders sold, assigned and transferred to Serta over $990 million in First Lien Term Loan in exchange for about $734 million in principal amount of First Lien Second Out Debt.[55] Below is a chart showing Serta's capital structure before and after the 2020 Transaction.



### d.      The DQ-List

A disqualified institutions list—or "DQ list"—prevents identified investors from purchasing a company's debt from existing holders. The Credit Agreement contained a DQ list.[56] Before the 2020 Transaction, the DQ list covered investment vehicles affiliated with several asset management firms. But on June 21, 2020—the day before closing—Serta's counsel e-mailed the Administrative Agent to update the DQ list with additional names covering principal members of the Excluded Lenders.[57] Any party who wished to be removed had to get permission from the Participating Lenders.

As a result, the Participating Lenders gained leverage. Some Excluded Lenders, however, sought and obtained that permission. For instance, Contrarian Capital Management, which had been added to the expanded DQ list, was allowed

---

[55] Exchange Agreement § 2.1(a), DX0547, Adv. ECF No. 581-66; March 2, 2026 Tr. 87:16–19 (Dudney), Adv. ECF No. 716.

[56] Credit Agreement §§ 9.05(b), (c), Debtors' Ex. 6, Case No. 23-90020, ECF No. 853-6.

[57] DX1380, Adv. ECF No. 590-93; March 3, 2026 Tr. 65:1–66:14 (Hanigan), Adv. ECF No. 677.

Contrarian to purchase about $40 million of First Lien Term Loans between September 2021 and late 2023.[58]

Between closing of the 2020 Transaction and the end of 2021, there were only 29 observable trades in the First-Lien Term Loans, totaling about $162 million—against the Plaintiffs aggregate position of over $700 million.[59] In some months, no trading occurred at all. UBS confirmed in a January 2021 chat that the first-lien term loans traded "very little" and were "pretty illiquid."[60] Apollo made repeated inquiries to UBS and Barclays through the second half of 2020 and into 2021, but there was not much activity.[61]

### e.      More Litigation After the 2020 Transaction

In July 2020, some LCM Lenders refiled in a New York federal court asserting similar claims against Serta and certain Participating Lenders.[62] The federal court dismissed for lack of subject matter jurisdiction. The LCM Lenders refiled against Serta in the same court, which had diversity jurisdiction. Serta moved to dismiss. The court denied the motion as to the breach of contract and implied covenant claims.

In November 2022, certain Excluded Lenders filed another complaint in New York state court against Serta and some Participating Lenders. This lawsuit raised many of the same core theories: breach of the waterfall and pro rata sharing provisions of the Credit Agreement and breach of the implied covenant of good faith and fair dealing.[63] Serta and the Participating Lenders moved to dismiss the amended complaint. As detailed below, Serta started the chapter 11 bankruptcy cases weeks later.

### f.      Cooperation Agreement After the 2020 Transaction

On September 28, 2020—about four months after the 2020 Transaction closed—certain Excluded Lenders entered into a cooperation agreement.[64] Several more parties joined over the following weeks.[65]

---

[58] March 3, 2026 Tr. 245:10–15 (Weisser), Adv. ECF No. 677 (getting off the DQ List "did not take an act of congress.").

[59]  March 6, 2026 Tr. 19:8, 22:8–11 (Murray), Adv. ECF No. 679.

[60] DX0513, Adv. ECF No. 581-34.

[61] DX0504, Adv. ECF No. 581-25; PTL Ex. No. 170, Adv. ECF No. 586-18; DX1301, Adv. ECF No. 590-11; DX0488, Adv. ECF No. 581-9.

[62] *LCM v. Serta Simmons Bedding, LLC*, No. 21 Civ 3987 (KPF), 2022 WL 953109, at *6, 14 (S.D.N.Y. Mar. 29, 2022).

[63] *See* Amended Complaint, *AG Centre St. P'ship L.P. v. Serta Simmons Bedding, LLC*, No. 654181/2022, NYSCEF 11 (N.Y. Sup. Ct. Nov. 16, 2022).

[64] The initial signatories were Apollo, Angelo Gordon, Gamut, and Ascribe. DX0548, Adv. ECF No. 581-67 at 7.

[65] DX0548, Adv. ECF No. 581-67 at 10–12.

The cooperation agreement was designed, in part, to block use of open baskets in the PTL Credit Agreement that could convert more debt into superior third-out priority debt. According to an Angelo Gordon partner, the goal was to "engage with the company as a unified group and prohibit the company's ability to do one-off exchanges."[66] The cooperation agreement imposed narrow transfer restrictions. It permitted a signatory to transfer, assign, or sell first-lien or second-lien debt "to any third party other than a restricted party."[67] A "restricted party" meant Serta, its affiliates, or any beneficial holder adverse to the signatories in pending or threatened litigation.[68] Practically, that meant the Participating Lenders. Before selling to anyone else, a signatory had to offer other co-op members a right of first refusal or an opportunity to participate in the sale on a pro rata basis, depending on timing.[69] In practice, the cooperation agreement did not prohibit selling.[70] Signatories sold First Lien Term Loans while the agreement was in effect.[71]

### g.        Chapter 11 Filing and This Adversary Proceeding

On January 23, 2023, Serta filed these chapter 11 cases.[72] It entered bankruptcy with a restructuring support agreement to reduce debt from $1.9 billion to $315 million through the equitization of the Participating Lenders' new first lien debt.[73]

That same day, Serta and Participating Lenders started this adversary proceeding against the Excluded Lenders and the LCM Lenders, seeking a declaration that the 2020 Transaction was a permissible open market purchase under § 9.05(g) and did not violate the implied covenant of good faith and fair dealing.[74]

The Excluded Lenders answered and filed counterclaims and third-party claims, seeking contract damages and rescission of the 2020 Transaction.[75] Their counterclaims asserted four theories: (i) a declaratory judgment that the 2020 Transaction and all implementing agreements were invalid; (ii) breach of § 2.18 of the Credit Agreement because the 2020 Transaction effected a non-pro rata payment that was not permitted by § 9.05(g); (iii) breach of § 9.02, on the ground

---

[66] March 3, 2026 Tr. 142:2-25 (Gladstone), Adv. ECF No. 677.

[67] DX0548, Adv. ECF No. 581-67 at 2; March 3, 2026 Tr. 21:18–22:14 (Kwon), Adv. ECF No. 677.

[68] DX0548, Adv. ECF No. 581-67 at 2.

[69] DX0548, Adv. ECF No. 581-67 at 2–3

[70] March 3, 2026 Tr. 143:5–9 (Gladstone), Adv. ECF No. 677.

[71] In March 2021, LMR received a waiver allowing them to sell around $4.4 million of Serta's First Lien Debt. DX1345, Adv. ECF No. 590-53. Alcentra also received a waiver to sell $11 million in November 2021 while being subject to the agreement. DX1337, Adv. ECF No. 590-45.

[72] *In re Serta Simmons Bedding, LLC*, Case No. 23-90020 (Bankr. S.D. Tex. Jan. 23, 2023).

[73] Restructuring Support Agreement, Case No. 23-90020, ECF No. 31-2.

[74] Complaint ¶¶ 1–50, Adv. No. 23-09001, ECF No. 1.

[75] Excluded Lenders' Answer and Counterclaims, Adv. ECF No. 66; Amended Complaint, Adv. ECF No. 38.

that the amendment of the pro rata sharing provisions required unanimous lender consent that was never obtained; and (iv) breach of the implied covenant of good faith and fair dealing.[76]

The LCM Lenders answered separately and filed their own counterclaims.[77] LCM Lenders asserted two breach of contract theories. First, that the 2020 Transaction altered the pro rata distribution provisions of §§ 2.18(b) and 2.18(c) without the unanimous consent required by § 9.02.[78] Second, they alleged the 2020 Transaction was not an "open market purchase" under § 9.05(g). The LCM Lenders also brought claims for breach of the implied covenant of good faith and fair dealing on the same grounds as the Excluded Lenders.

Serta and the Participating Lenders then moved for summary judgment.[79] The Excluded Lenders and the LCM Lenders opposed.[80] In April 2023, the prior bankruptcy judge granted partial summary judgment for Serta and the Participating Lenders on the open market purchase issue and denied it on the implied covenant and other contract claims.[81] The bankruptcy judge ultimately certified the order for direct appeal to the Fifth Circuit.

Between May 15 and May 25, 2023, the bankruptcy judge also held a combined trial on confirmation of Serta's plan of reorganization and the remaining claims in the adversary proceeding.[82] In June 2023, the judge issued a memorandum opinion.[83] The judge found there was no breach of the Credit Agreement because of the open market purchase exception and concluded that the 2020 Transaction was not prohibited by its terms.[84] The judge also denied the implied covenant of good faith and fair dealing claim against the Participating Lenders, finding that the Participating Lenders acted defensively and in good faith.[85] The judge also noted that the Excluded Lenders tried to stop the 2020 Transaction by offering $30 million to persuade Participating Lenders and found that certain other acts to enact a different liability management transaction revealed the "true motives" of the Excluded Lenders, including an "objective lack of

---

[76] Excluded Lenders' Answer and Counterclaims at 48–86, Adv. ECF No. 66.

[77] LCM Defendants' Amended Counterclaims and Answer, Adv. ECF No. 146.

[78] LCM Defendants' Amended Counterclaims and Answer ¶¶ 154–64, Adv. ECF No. 146.

[79] Serta's Motion for Summary Judgment, Adv. ECF No. 69; Participating Lenders' Memorandum of Law in Support of Motion for Summary Judgment, Adv. ECF No. 73.

[80] Excluded Lenders' Opposition to Motion for Summary Judgment, Adv. ECF No. 86; LCM Defendants' Opposition to Motion for Summary Judgment, Adv. ECF No. 79.

[81] Order Granting Partial Summary Judgment, Adv. ECF No. 141 at 2.

[82] Memorandum Opinion, Adv. ECF No. 324 at 1, 7–17.

[83] Memorandum Opinion, Adv. ECF No. 324.

[84] Memorandum Opinion, Adv. ECF No. 324 at 17.

[85] Memorandum Opinion, Adv. ECF No. 324 at 17.

good faith."[86] And that "[o]n the scale of equity, it is the conduct of the [Excluded] Lenders that raises an eyebrow."[87]

### h.    Final Judgment and Appeals

On June 14, 2023, the bankruptcy judge entered a final judgment in the adversary proceeding.[88] The judge granted Serta and the Participating Lenders' claims for declaratory judgment, denied all counterclaims for breach of contract and breach of the implied covenant, and confirmed the chapter 11 plan.[89]

### i.    Appeals to the Fifth Circuit

The parties filed four consolidated appeals before the Fifth Circuit.[90] On December 31, 2024, the Fifth Circuit issued its opinion, as revised on January 21 and February 14, 2025.

The Fifth Circuit reversed and held that the 2020 Transaction was not a permissible "open market purchase" under the Credit Agreement.[91] The Fifth Circuit also vacated the post-trial judgment and remanded for reconsideration, stating that if the 2020 Transaction was not permitted under § 9.05(g), then the Excluded Lenders had a strong case that Serta and the Participating Lenders breached the Credit Agreement.[92]

The Fifth Circuit also dismissed the LCM Lenders from the final judgment appeal on the ground that they had abandoned their appeal during oral argument. The LCM Lenders petitioned for rehearing or clarification. The Circuit denied rehearing but granted the clarification motion, adding a footnote that its dismissal "does not prevent the LCM Lenders from recovering any damages to which they might be entitled based on the open market purchase issue."[93] Serta appealed the Fifth Circuit decision to the U.S. Supreme Court. The Supreme Court denied certiorari.

---

[86] Memorandum Opinion, Adv. ECF No. 324 at 7.

[87] Memorandum Opinion, Adv. ECF No. 324 at 17.

[88] Final Judgment, Adv. ECF No. 328 at 1.

[89] Final Judgment, Adv. ECF No. 328 at 2–4.

[90] *Serta*, 125 F.4th 555.

[91] *Serta*, 125 F.4th at 579–81.

[92] *Serta*, 125 F.4th at 584.

[93] *Serta*, 125 F.4th at 576 n.11.

### j.   Proceedings on Remand

The Fifth Circuit issued its mandate on February 26, 2025.[94] Following reassignment of the case, the remanded proceedings came to this Court.

### i.   LCM's Amended Counterclaim & the Participating Lenders' Motion to Dismiss

On August 12, 2025, the parties filed a stipulation permitting the LCM Lenders to file an amended complaint without waiving any party's arguments. The LCM Lenders filed their amended counterclaims and third-party claims on the same day.[95] Their sole counterclaim was for breach of contract based on the open market purchase issue—specifically, that the 2020 Transaction was an invalid open market purchase under § 9.05(g), and that the LCM Lenders were deprived of their contractual rights, including the right to receive a pro rata share of collateral proceeds.[96]

The Participating Lenders moved to dismiss with prejudice based on, among other things, failure to state a claim.[97] The LCM Lenders filed an opposition and, in the alternative, a conditional cross-motion under Rule 60(b)(5).[98] After a hearing, the Court denied the Participating Lenders' motion to dismiss.[99]

### ii.   Serta's Motion for Summary Judgment

In August 2025, Serta moved for summary judgment on all remaining counterclaims against it.[100] Serta claimed the chapter 11 plan discharge, release, and extinguishment provisions cancelled all claims and causes of action against the reorganized debtor arising from the Credit Agreement and the 2020 Transaction. After the Supreme Court denied certiorari to Serta's appeal of the Fifth Circuit decision, no party objected. In November 2025, the Court granted Serta's motion for summary judgment.[101]

### k.   Trial

Trial between the Excluded Lenders and the LCM Lenders (collectively, "**Plaintiffs**") against the Participating Lenders ran from March 2 through March 6,

---

[94] *Serta*, 125 F.4th at 555.

[95] Stipulation, Adv. ECF No. 373; LCM Defendants' Amended Counterclaims and Third-Party Claims, Adv. ECF No. 374.

[96] Amended Counterclaim at 1, Adv. ECF No. 374

[97] Participating Lenders' Motion to Dismiss, Adv. ECF No. 387.

[98] LCM Defendants' Opposition and Conditional Cross-Motion, Adv. ECF No. 422.

[99] Order Denying Motion to Dismiss, Adv. ECF No. 512; Tr. ECF No. 520.

[100] Serta Motion for Summary Judgment, Adv. ECF No. 375.

[101] Order Granting Summary Judgment, Tr. at 9, Adv. ECF No. 462

2026. Closing arguments were held on March 25. Plaintiffs' arguments at trial focused on the following main points:

- The $734 million in First Lien Second Out debt provided to the Participating Lenders in exchange for their $992 million in First Lien Term Loans was a "payment in respect of" such principal under § 2.18 (c) of the Credit Agreement.

- Section 2.18(c) required Participating Lenders who obtained a non-ratable payment to "purchase (for Cash at face value) participations" in non-participating First Lien Term Loans to ensure ratable treatment among lenders in the same class.

- The Participating Lenders never purchased participations in the First Lien Term Loans from the Excluded Lenders and the LCM Lenders, thus they must pay damages plus prejudgment interest.

- The Participating Lenders' defenses fail.

The Participating Lenders argue that no damages, or limited damages, are warranted because:

- The debt exchange in the 2020 Transaction was not "payment in respect of" such principal, and thus did not trigger ratable treatment under § 2.18(c),
    - The LCM Lenders also abandoned or otherwise never asserted any claim for damages based on § 2.18(c).
    - Contrarian, an Excluded Lender, failed to establish standing to seek damages.

- Even if there is a breach under § 2.18(c), the Excluded Lenders' conduct should not be rewarded.
    - The prior bankruptcy judge found that the Excluded Lenders acted with an objective lack of good faith and that the Participating Lenders acted defensively and in good faith.
        - The findings are binding in this trial.

- Unclean hands and in pari delicto bar damages.

- Plaintiffs seek a windfall recovery and their alleged damages defy economic reality.
    - Excluded Lenders failed to mitigate.

- Prejudgment interest under New York law is exorbitant and should be limited or waived.

### Analysis

Below are the Court's findings of fact and conclusions of law.

### a.      Contrarian Has Standing to Sue

The Participating Lenders argue that Contrarian failed to establish standing to assert claims. The record proved otherwise.

Standing requires "an interest in the claim at issue in the lawsuit that the law will recognize as a sufficient predicate for determining the issue at the litigant's request." *Caprer v. Nussbaum*, 825 N.Y.S.2d 55, 62 (2d Dep't 2006). Under New York law, "contracts are freely assignable absent language which expressly prohibits assignment." *In re Stralem*, 758 N.Y.S.2d 345, 347 (2d Dep't 2003). The "assignee . . .  stands in [the] shoes [of the assignor] . . . [t]he assignment grants [the assignee] the same rights and interests with regard to the . . . claim to which [the assignor] had been entitled." *Durham Com. Cap. Corp. v. Wadsworth Golf Constr. Co. of Midwest*, 76 N.Y.S.3d 693, 695 (4th Dep't. 2018) (*quoting Madison Liquidity Invs. 119, LLC v. Griffith*, 869 N.Y.S.2d 496 (1st Dep't 2008)).

Assignments were permitted under the Credit Agreement if they satisfied § 9.05(b)(ii).[102] Section 9.05(b)(ii)(C) required parties to deliver to the Administrative Agent an "Assignment Agreement."[103] Assignment Agreement is defined as an "Assignment and Assumption," which is "an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.05), and accepted by the Administrative Agent in the form of Exhibit A-2 or any other form approved by the Administrative Agent and the Top Borrower."[104]

Contrarian purchased loans from counterparties between September 2021 and December 2022 (recall it had to get permission to buy because it was on the DQ list).[105] Contrarian's managing director, and the evidence confirmed, that each counterparty assigned all "rights and obligations in its capacity as a lender under the First Lien Term Loan Agreement . . ." including "all claims, suits, causes of

---

[102] Credit Agreement § 9.05(b), Debtors' Ex. 6, Case No. 23-90020 ECF No. 853-6.

[103] Credit Agreement § 9.05(b)(ii), Debtors' Ex. 6, Case No. 23-90020 ECF No. 853-6.

[104] Credit Agreement § 1.01, Debtors' Ex. 6, Case No. 23-90020 ECF No. 853-6 .

[105] Trade confirmations between Credit Suisse Loan Funding LLC and Contrarian Funds, LLC: DX0809, Adv. ECF No. 588-43 at 20, 22 (dated September 22, 2021, and September 23, 2021); DX0807, Adv. ECF No. 588-41 at 14, 16 (dated March 7, 2022, and April 29, 2022). Trade confirmation between Bank of America, N.A. and Contrarian Funds, LLC: DX0805, Adv. ECF No. 588-39 at 9 (dated February 17, 2022). Trade confirmation between Wells Fargo Bank, National Association and Contrarian Funds, LLC: DX0806, Adv. ECF No. 588-40 at 9 (dated March 30, 2022). Trade confirmations between Seaport Loan Products LLC and Contrarian Funds, LLC: DX0808, Adv. ECF No. 588-42 at 9 (dated May 3, 2022); DX0803, Adv. ECF No. 588-37 at 3 (December 15, 2022); DX0804, Adv. ECF No. 588-38 at 3 (dated December 16, 2022). A voluminous summary of these trades was admitted into evidence at Adv. ECF No. 642-1.

actions . . . arising under or in connection with the First Lien Term Loan Agreement . . . "[106] This included "contract claims."[107] The assignment and assumption documents also included Standard Terms and Conditions for Assignment and Assumption.

The Standard Terms and Conditions contain representations and warranties by counterparties to trades. Trade counterparties represented and warranted that they were the "beneficial owner of the Assigned Interest" and that "the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim."[108] Contrarian's Managing Director also confirmed that the assignment and assumption documents used were standard and based on a form appended to the Credit Agreement.[109] Finally, the assignment and assumption documents were accepted by the Administrative Agent under the Credit Agreement.[110]

Taken together, the evidence shows that Contrarian acquired the rights to seek recovery on the breach of contract claim. And that its assignments are valid

---

[106] Assignment and Assumption, Credit Suisse Loan Funding LLC and Contrarian Funds, LLC: DX0809, Adv. ECF No. 588-43 at 24, DX0807, Adv. ECF No. 588-41 at 18. Assignment and Assumption, Bank of America, N.A. and Contrarian Funds, LLC: DX0805, Adv. ECF No. 588-39 at 11. Assignment and Assumption, Wells Fargo Bank, National Association and Contrarian Funds, LLC: DX0806, Adv. ECF No. 588-40 at 12. Assignment and Assumption, Seaport Loan Products LLC and Contrarian Funds, LLC DX0803, Adv. ECF No. 588-37 at 5, DX0804, Adv. ECF No. 588-38 at 5, DX0808, Adv. ECF No. 588-42 at 11. A voluminous summary of these documents was admitted into evidence at Adv. ECF No. 642-1.

[107] Assignment and Assumption, Credit Suisse Loan Funding LLC and Contrarian Funds, LLC: DX0809, Adv. ECF No. 588-43 at 24, DX0807, Adv. ECF No. 588-41 at 18. Assignment and Assumption, Bank of America, N.A. and Contrarian Funds, LLC: DX0805, Adv. ECF No. 588-39 at 11. Assignment and Assumption, Wells Fargo Bank, National Association and Contrarian Funds, LLC: DX0806, Adv. ECF No. 588-40 at 12. Assignment and Assumption, Seaport Loan Products LLC and Contrarian Funds, LLC DX0803, Adv. ECF No. 588-37 at 5, DX0804, Adv. ECF No. 588-38 at 5, DX0808, Adv. ECF No. 588-42 at 11. A voluminous summary of these documents was admitted into evidence at Adv. ECF No. 642-1.

[108] Standard Terms and Conditions, Credit Suisse Loan Funding LLC and Contrarian Funds, LLC: DX0809, Adv. ECF No. 588-43 at 29, DX0807, Adv. ECF No. 588-41 at 23. Standard Terms and Conditions, Bank of America, N.A. and Contrarian Funds, LLC: DX0805, Adv. ECF No. 588-39 at 16. Standard Terms and Conditions, Wells Fargo Bank, National Association and Contrarian Funds, LLC: DX0806, Adv. ECF No. 588-40 at 17. Standard Terms and Conditions, Seaport Loan Products LLC and Contrarian Funds, LLC: DX0803, Adv. ECF No. 588-37 at 10, DX0804, Adv. ECF No. 588-38 at 10, DX0808 Adv. ECF No. 588-42 at 17. A voluminous summary of these documents was admitted into evidence at Adv. ECF No. 642-1.

[109] March 3, 2026 Tr. 209:19–24 (Weisser), Adv. ECF. No. 677.

[110] Consent and Acceptance, Credit Suisse Loan Funding LLC and Contrarian Funds, LLC: DX0809, Adv. ECF No. 588-43 at 28; DX0807, Adv. ECF No. 588-41 at 22. Consent and Acceptance, Bank of America, N.A. and Contrarian Funds, LLC: DX0805, Adv. ECF No. 588-39 at 15. Consent and Acceptance, Wells Fargo Bank, National Association and Contrarian Funds, LLC: DX0806, Adv. ECF No. 588-40 at 16. Consent and Acceptance, Seaport Loan Products LLC and Contrarian Funds, LLC: DX0803, Adv. ECF No. 588-37 at 9; DX0804, Adv. ECF No. 588-38 at 9; DX0808, Adv. ECF No. 588-42 at 16. A voluminous summary of these documents was admitted into evidence at Adv. ECF No. 642-1.

and enforceable against the Participating Lenders. There is no meaningful evidence to the contrary.

### b.      The LCM Lenders Did Not Waive The Breach of Contract Claim

The Participating Lenders allege that the LCM Lenders abandoned their breach of contract claim under § 2.18(c). The Court disagrees.

The Fifth Circuit "remand[ed] for reconsideration of the Excluded Lenders' breach of contract counterclaims." *Serta*, 125 F.4th at 584. After the LCM Lenders moved to clarify, the Fifth Circuit said that on remand, the LCM Lenders could likewise "recover[] any damages to which they might be entitled based on the open market purchase issue." *Id.* at 576 n.11. The Fifth Circuit also said that if the 2020 Transaction "was not permitted under the open market purchase exception in § 9.05(g)," there was "a strong case that [Serta] and the [Participating] Lenders breached the [Credit] Agreement." *Id.* at 584.

The LCM Lenders properly plead a breach a contract claim against the Participating Lenders. In their Amended Counterclaim, the LCM Lenders allege that "Section 2.18(c) of the [Credit] Agreement requires any First Lien Lender that receives payment on account of its loans—including a distribution of collateral proceeds—that is greater than its pro rata share to pay the excess ratably to the other First Lien Lenders." [111] And that § 9.05(g)'s open-market purchase exception— the purported justification for the Exchange Transaction—did not apply.[112] And, because of the Participating Lenders' material breach, the LCM Lenders were deprived of their contractual rights to receive a pro rata share of collateral proceeds on a first-lien basis "(including any and all consideration the PTL Lenders received for their participation" in the 2020 Transaction)."[113] They also alleged damages in an amount to be proven at trial. [114]

Thus, the LCM Lenders established that § 2.18(c) required pro rata treatment between lenders, that the 2020 Transaction and the Participating Lenders' breach deprived them of a pro rata share of proceeds under the Credit Agreement, and that the LCM Lenders are entitled to damages. The breach is based on the Participating Lenders exchanging debt in violation of the pro rata sharing requirement under § 2.18(c) and the damages sought comes from § 2.18(c) too. The LCM Lenders did not waive the breach of contract claim.

---

[111] LCM Lender Amended Counterclaim ¶25, Adv. ECF No. 374.
[112] LCM Lender Amended Counterclaim ¶42, Adv. ECF No. 374.
[113] LCM Lender Amended Counterclaim ¶51, Adv. ECF No. 374.
[114] LCM Lender Amended Counterclaim ¶52, Adv. ECF No. 374.

### c.  Breach of Contract

Under New York law, a breach of contract claim has four components: (i) the existence of a contract, (ii) plaintiff's performance under the contract, (iii) the defendant's breach of contractual obligations, and (iv) damages caused by the defendant's breach. *See 34–06 73, LLC v. Seneca Ins.*, 39 N.Y.3d 44, 52 (N.Y. 2022). The first two elements are easily satisfied. The Credit Agreement is the contract at issue and the record reflects that Plaintiffs held the debt and the associated right to assert the breach of contract claim. Testimony from Plaintiffs' witness also confirmed compliance as lenders under the Credit Agreement.[115] There is no evidence that any Plaintiff failed to perform an obligation under the Credit Agreement. The last two elements are disputed.

In New York, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent" and "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records,* 98 N.Y.2d 562, 569 (2002) (internal quotation marks and citation omitted). Any unambiguous provision of a contract is given its plain and ordinary meaning. *Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 749 (S.D.N.Y. 2016), *aff'd*, 712 F. App'x 57 (2d Cir. 2017). Courts must interpret contracts to give "full meaning and effect to the material provisions" and avoid interpretations that render certain provisions meaningless. *AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*, 185 N.Y.S.3d 73, 84 (1st Dep't 2023). Thus, a "contractual provision that is clear on its face must be enforced according to the plain meaning of its terms." *Bank of N.Y. Mellon v. WMC Mortg., LLC*, 22 N.Y.S.3d 3, 6 (1st Dep't 2015) (citation omitted).

The relevant provisions of the Credit Agreement are unambiguous, so the text provides the answer. Plaintiffs allege the Participating Lenders breached § 2.18(c) of the Credit Agreement:

> If any Lender obtains payment . . . in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of

---

[115] *See also Bykowsky v. Eskenazi*, No. 0600681/1999, 2007 WL 4176982 (N.Y. Sup. Ct. Nov. 14, 2007) ("Every party to such a [multi-party] contract is bound only to the extent of the promises made by him . . .") (quoting *Berry Harvester Co. v. Walter A. Wood Mowing & Reaping Mach. Co.,* 152 N.Y. 540, 547 (1897)) (brackets in original).

all such payments shall be shared by the Lenders of such Class ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class.[116]

Based on the plain language of § 2.18(c), Plaintiffs must establish that:

- Participating Lenders obtained a "payment";

- in respect of any principal of or interest on any of its Loans of any Class held by the Participating Lenders;

- resulting in the Participating Lenders receiving payment of a greater proportion of the total amount of its Loans of such Class and accrued interest than the proportion received by any other Lender with Loans of such Class (*i.e.*, a non-pro rata distribution); and

- Participating Lenders did not purchase (for Cash at face value) participations in the Loan of other Lenders (*i.e.*, Plaintiffs) to the extent necessary so that the benefit of all such payments would be shared ratably.

### i.        The Participating Lenders Received a "Payment"

The Participating Lenders argue the debt exchanged under the 2020 Transaction was not a "payment" that triggered pro rata treatment under § 2.18(c). Plaintiffs disagree. Plaintiffs are right.

A "payment" is not defined in the Credit Agreement. So its meaning is derived from the usage within § 2.18 and throughout the Credit Agreement. *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992) ("The best evidence of the parties' intent is what is contained within their writing."). The Credit Agreement references "payment" several hundred times. The phrase is sometimes used generally to refer to a general receipt; *i.e.* "any payment," and sometimes as a specific one like "the payment" and "such payment."[117] There are also more specifically defined uses, like Cash payment, Scheduled payment, Deferred payment, and Penalty payment.

Section 2.18 is labeled "**Payments Generally; Allocation of Proceeds; Sharing of Payments**." Section 2.18(a) describes when and how a borrower must make payments, and how the Administrative Agent distributes these payments to lenders:

> (a) Unless otherwise specified, the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts

---

[116] Credit Agreement § 2.18(c), Debtors' Ex. 6, Case No. 23-90020 ECF No. 853-6.
[117] Credit Agreement §§ 6.01(gg); 6.04(b), Debtors' Ex. 6, Case No. 23-90020 ECF No. 853-6.

19 / 48

payable under Section 2.15, 2.16 or 2.17, or otherwise) prior to 3:00 p.m. on the date when due, in immediately available funds, without set-off or counterclaim . . . Except as provided in Sections 2.19(b) and 2.20, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest in respect of the Loans of a given Class and each conversion of any Borrowing to, or continuation of any Borrowing as, a Borrowing of any Type (and of the same Class) shall be allocated pro rata among the Lenders in accordance with their respective Applicable Percentages of the applicable Class. . . . All payments hereunder shall be made in Dollars. . . .

The Participating Lenders focus on the payment "in Dollars" language and argue it applies to § 2.18(c), and not just § 2.18(a). Based on this understanding, they argue that a "payment" under § 2.18(c) is cash based and does not apply to debt exchanges like the 2020 Transaction. If true, then the Participating Lenders did not receive a "payment" that triggered ratable sharing under § 2.18(c). This is a creative argument, but it ultimately fails upon a close textual analysis.

The Participating Lenders overlook important textual distinctions between § 2.18(a) and (c). Section 2.18(a) details the mechanics of payments by the borrower to its lenders through the Administrative Agent. It requires Serta to make payments in "Dollars," which is defined as the lawful money of the U.S.[118] The "Dollars" requirement affects the borrowers payments to its lenders.

Section 2.18(c) is drafted broadly and governs what happens when a lender receives consideration in any form and from any source in respect of its principal or interest. The "Dollars" limitation is not included in § 2.18(c). And that makes sense because this section is designed to protect ratable treatment between lenders in the same class of loans.

Section 2.18(c) confirms the difference between borrower and lender payments by identifying non-cash exchanges as forms of "payment." It says that "If any Lender obtains payment (whether voluntary, involuntary, ***through the exercise of any right of set-off or otherwise***) in respect of any principal . . . ." (emphasis added). A set-off is a non-cash exchange. The "or otherwise" catch-all is also open-ended and not limited to cash.[119] The debt exchange in the 2020 Transaction is covered by the "or otherwise" catch-all.

---

[118] Credit Agreement, Debtors' Ex. 6, Case No. 23-90020 ECF No. 853-6 at 22.

[119] Any ambiguity in the phrase "or otherwise" still supports a reading that includes non-cash exchanges as payments based on the surrounding words like voluntary, involuntary, and exercise of any right of setoff. That is because, a word is known by its companions, and the meaning of term in a series is gleamed by those around it. *Matter of Kese Indus. v. Roslyn Torah Found.*, 914 N.Y.S.2d 704 (2010) (applying noscitur a sociis); *see also* Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012).

There is more. Section 2.18(c) also provides a carve-out to ratable treatment for payments made under §§ 2.22, 2.23, 9.02(c), and 9.05(g)—which are all non-cash payments:

- Section 2.22 allowed Serta to replace existing loans with "Incremental Loans" under a new facility if they were pari passu or junior to the First Lien Term Loans (not applicable here);

- Section 2.23 allowed Serta to replace existing loans with "Extended Term Loans" if they were pari passu or junior to the First Lien Term and offered to all lenders on a pro rata basis (not applicable here);

- Section 9.02(c) allowed Serta to replace existing loans with "Replacement Term Loans" if they were pari passu or junior to the First Lien Term (not applicable here); and

- Section 9.05(g) permitted open-market purchases (which the Fifth Circuit said didn't happen here).

If debt exchanges don't trigger § 2.18(c) there would be no need to carve-out these non-cash transactions. These sections would be surplusage. And New York law requires courts to avoid interpretations that render provisions meaningless or surplusage. *AEA Middle Mkt. Debt Funding LLC*, 185 N.Y.S.3d at 84. This Court also cannot and will not "through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements." *Nomura Home Equity Loan, Inc. Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 748 (2017).

Also, under New York law, a specific contractual provision controls over a general one. *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) ("Even if there was an inconsistency between a specific provision and a general provision of a contract . . . the specific provision controls); *Teliman Holding Corp. v. VCW Assoc.*, 180 N.Y.S.3d 109 (1st Dep't 2022). Section 2.18(a) is a payment provision governing borrower payments to its lenders. Section 2.18(c) is a provision that directly addresses payments that trigger ratable sharing, including four express carve-outs for non-cash transactions described below. So § 2.18(a) does not override the specific carve-out structure the parties drafted into § 2.18(c).

Finally, the parties included specific references to "Cash" in the Credit Agreement when they wanted to. And "Cash" means "money, currency or a credit balance in a deposit account, in each case as determined in accordance with GAAP."[120] For example, the Credit Agreement defines terms like "Incremental Cap" as an amount "paid in Cash."[121] Section 6.04(b) also prohibited Serta from making prepayments in Cash in respect of principal or interest on junior indebtedness.[122]

---

[120] Credit Agreement, Debtors' Ex. 6, Case No. 23-90020 ECF No. 853-6  at 6, 33.

[121] Credit Agreement, Debtors' Ex. 6, Case No. 23-90020 ECF No. 853-6 at 8.

[122] Credit Agreement § 6.04(b), Debtors' Ex. 6, Case No. 23-90020 ECF No. 853-6.

Section 2.18(c) is broadly drafted and requires ratable sharing whenever a lender receives a payment in respect of principal or interest on account its loan—whether voluntary, involuntary, by setoff, or otherwise (which would include but not be limited to Cash). But once ratable treatment is triggered § 2.18(c) specifically requires lenders buy participations for "Cash" as the consequence of receiving a non-pro rata payment.

Section 1.09 also provides that a cashless rollover replacing or renewing an existing loan is deemed to comply with requirements elsewhere that "such payment be made 'in Dollars', 'in immediate available funds', 'in Cash' or any other similar requirement."[123] The use of "in Dollars" and "in Cash" in § 1.09 shows that there may be payments made in Dollars that are not always Cash. Thus, the parties knew when and how to include Cash when they wanted to. And they didn't do it in § 2.18(c). The four-corners intertextual analysis answers the question here.[124]

The Participating Lenders attempted to use a definition of payment as considered in a Loan Syndications and Trading Association ("**LSTA**") book that was not referenced or incorporated into the Credit Agreement. For technical terms, New York courts consider their generally accepted meaning as understood by people in the profession. *See Serta*, 125 F.4th at 579 (citation omitted). Payment, however, is not a technical term. The Participating Lenders argue that industry understanding was consistent with defining "payment" as only a transfer of cash. They solicited trial testimony to support this.[125] Several Plaintiffs confirmed, however, that LSTA terms were not considered, used by them, or even known.[126] It is also irrelevant because New York law does not permit industry custom or practice to determine the meaning of a contract term when the meaning is found within the four corners of the contract.[127]

---

[123] Credit Agreement § 1.09, Debtors' Ex. 6, Case No. 23-90020 ECF No. 853-6.

[124] The textual analysis of the Credit Agreement stands on its own. But for even further confirmation, the plain language definition of "payment" is also broad and covers non-cash consideration. *See, e.g., Serta*, 125 F.4th at 578 (citing *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29 (2002)) (looking to dictionary for undefined term). Black's Law Dictionary provides two definitions of "payment": (1) "[p]erformance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation," and (2) "[t]he money or other valuable thing so delivered in satisfaction of an obligation." *Payment*, BLACK'S LAW DICTIONARY (12th ed. 2024). Webster's Third New International Dictionary defines "payment" as "the act of paying or giving compensation: the discharge of a debt or an obligation" and "something given to discharge a debt or obligation." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002).

[125] March 4, 2026 Tr. 39:5–12, 41:2–14, 35:16–17, 36:11–13 (Daniello), Adv. ECF No. 676.

[126] March 3, 2026 Tr. 69:6–16 (Hanigan), Adv. ECF No. 677 (When asked, the witness testified that he had not previously heard of the LSTA Guidebook, nor was he aware of anyone at his firm using it); March 3, 2026 Tr. 121:7–16 (Gladstone), Adv. ECF No. 677 (Mr. Gladstone testified that he had heard of the LSTA Guide, but had not used it); March 3, 2026 Tr. 269:20–270:2 (Tavangar), Adv. ECF No. 677 (Mr. Tavangar testified that he had heard of the LSTA Guide, but had not used it);

[127] *See Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002).

For these reasons, the text of the Credit Agreement shows that the Participating Lenders received a payment within the meaning of § 2.18(c). Section 2.18(c) is designed to capture pro rata treatment for all consideration in respect of principal or interest on a loan. The Participating Lenders structured the 2020 Transaction as an attempted open-market transaction falling within an express carve-out under § 2.18(c). It didn't work, so § 2.18(c) applies. Under the plain language of § 2.18(c), the Participating Lender received a payment and no other carve-out applies.

### ii.       The Payment Was "In Respect of Principal"

The next question is whether the payment received by the Participating Lenders was "in respect of principal" on the First Lien Term Loan. The Participating Lenders say no because the debt exchange allegedly did not affect the principal due on First Lien Term Loan nor was it a principal or interest payment on the First Lien Term Loan. The Court disagrees.

"In respect of" is not defined in the Credit Agreement, but it is used several hundred times (including schedules). As used in the Credit Agreement it broadly refers to matters concerning something, regarding something, or in connection with something. Here are a few examples (emphasis added):

- Any documentation *in respect of* any Extension shall be consistent with the foregoing. § 2.23(a)(x)

- None of Holdings, the Top Borrower nor any Restricted Subsidiary shall be required to disclose or provide any information . . . (d) *in respect of* which Holdings, the Top Borrower or any Restricted Subsidiary owes confidentiality obligations to any third party. § 5.01(l)

- Holdings and the Top Borrower will, and the Top Borrower will cause each of its Restricted Subsidiaries to, pay all Taxes imposed upon it or any of its properties or assets or *in respect of* any of its income or businesses or franchises before any penalty or fine accrues thereon. § 5.03.

- No action shall be required to perfect a Lien in any asset *in respect of* which the perfection of a security interest therein would (1) be prohibited by enforceable anti-assignment provisions set forth in any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement. § 5.12(l)

- The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or otherwise become or remain liable with respect to any Indebtedness, except: . . . (f) Indebtedness of the Top Borrower and/or any Restricted Subsidiary *in respect of* Banking Services . . . . § 6.01(f)

- The entry by a court of competent jurisdiction of a decree or order for relief *in respect of* Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) in an involuntary case under any Debtor Relief Law. § 7.01(f)

- Indebtedness *in respect of* the Lease Agreement. Schedule 6.01

This construction is also consistent with its ordinary dictionary meaning. *See In respect of,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (meaning concerning and with respect to).

The Participating Lenders and Plaintiffs were "Lenders" in the same "Class" of First Lien Term Loans. At the time of the 2020 Transaction, all Lenders were owed principal and interest on their First Lien Term Loans. The Participating Lenders received a payment in the 2020 Transaction that satisfied principal on the First Lien Term Loan. This payment was "in respect of" their First Lien debt because it was in connection with and concerning the First Lien Term Loan. This construction is confirmed by the signature pages to the Exchange Agreement, which show that each Participating Lender received a "Principal amount of Initial Exchanged Term Loans" that was equal to 74% of the "***Principal amount of Purchased First Lien Loans***" (*i.e.*, the principal amount outstanding on each Participating Lender's First Lien Term Loans). The direct connection between the debt exchange effected during the 2020 Transaction and the satisfaction of the Participating Lender's First Lien Term Loans could not be clearer.

### iii.   The Payment Was In Respect of Principal on "Loans" in the "Class" Held by the Participating Lenders

The Participating Lenders also claim that any payment was not in respect of their First Lien Term Loan, instead it was on account of a new loans issued as consideration for the purchase of the first and second-lien loans. This argument disregards the meaning of "in respect of" as meaning in connection with or concerning and the 2020 Transaction itself.[128]

And, as noted above, Serta and the Participating Lenders tried to structure the debt exchange as an open market purchase under § 9.05(g) to avoid § 2.18(c) (which ultimately did not work). Here is proof from the Exchange Agreement:

---

[128] The Participating Lenders cite a non-binding prior New York Court decision on a motion for a preliminary injunction in the earlier LCM case as supporting their position. *LCM XXII Ltd.*, 2022 WL 953109, at *8. That court also never addressed § 2.18. This Court relies on its textual analysis and the record.

WHEREAS, Section 2.18(c) under each of the Existing First Lien Credit Agreement and the First Lien Credit Agreement does not apply to any payments made as consideration for the assignment of Existing First Lien Term Loans pursuant to Section 9.05 thereof).[129]

The Exchange Agreement also says that the Participating Lenders agreed to "sell, assign, and transfer" "Purchased First Lien Term Loans" to the "Specified Borrowers." (which is Serta).[130] And as "consideration" for the "sale, assign[ment] and transfer" of the Participating Lender's First Lien Term Loans to Serta, Serta gave the Participating Lenders First Lien Second Out Debt in an amount "equal to 74.0%" of the Participating Lenders' "Purchased First Lien Loans."[131] There is more.

The signature pages to the Exchange Agreement show the principal amount of purchased First Lien Term Loan each Participating Lender sold, assigned, and transferred to Serta and the corresponding new First Lien Second Out debt each Participating Lender received for First Lien Term Loan debt.[132] And after new debt was issued to the Participating Lenders, Serta had to retire and cancel the First Lien Term Loan debt it purchased, and without any duty to pay it.[133] This contemporaneous evidence leaves no doubt the new First Lien Second Out debt was a payment in respect of the First Lien Term Loans, and that the First Lien Term Loan, the Participating Lenders, and Plaintiffs were all in the same Class of Loans under the Credit Agreement.

### iv.    The Last Two Prongs for Breach are Satisfied

The Participating Lenders received a payment in respect of their First Lien Term Loan without purchasing participations in Plaintiffs' First Lien Term Loans. The payment the Participating Lenders received was on account of and in satisfaction of their First Lien Term Loan debt. The fact that the Participating Lenders exchanged their First Lien Term Loan at a discount is irrelevant. Section 2.18(c) focuses on whether the Participating Lenders recovered a greater proportion of their Loans than the proportion received by other Lenders. And they did. The Participating Lenders received a payment on their First Lien Term Loan. Plaintiffs received nothing.

### d.    Statements in a Prior Decision Are Not Law of the Case Here

The Participating Lenders argue that the prior bankruptcy judge's statements in a separate trial about the Excluded Lenders' objective lack of good faith are law of the case, and that the Excluded Lenders forfeited any right to

---

[129] Exchange Agreement, DX0547, Adv. ECF No. 581-66 at 2.

[130] Exchange Agreement § 2.1(a), DX0547, Adv. ECF No. 581-66.

[131] Exchange Agreement § 2.1(a), DX0547, Adv. ECF No. 581-66.

[132] Exchange Agreement at pp. 16–301, DX0547, Adv. ECF No. 581-66.

[133] Exchange Agreement § 2.1(d), DX0547, Adv. ECF No. 581-66.

contest it by not appealing it. The Excluded Lenders say any such findings are non-binding dicta that were not necessary to any part of the judge's rulings. The Excluded Lenders are right.

The law-of-the-case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)); *Lewis Brisbois Bisgaard & Smith LLP v. Bitgood*, No. 24-20458, 2026 WL 561181, at *2 (5th Cir. Feb. 27, 2026) (law of the case applies only when a panel actually decided an issue).

The doctrine does not apply to dicta. *Society of Roman Catholic Church of Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co.*, 126 F.3d 727, 735 (5th Cir. 1997). Dicta is a judicial comment that is unnecessary to the decision. *In re Hearn*, 376 F.3d 447, 453 (5th Cir. 2004); BLACK'S LAW DICTIONARY 1100 (12th ed. 2024). A statement is dicta if it "could have been deleted without seriously impairing the analytical foundations of the holding." *In re Cajun Elec. Power Coop., Inc.,* 109 F.3d 248, 256 (5th Cir. 1997).

A related but different question is waiver. The Fifth Circuit has held that "if an issue was decided by the [lower] court but was not appealed, the issue is forfeited, and the [lower] court may not reconsider the issue on remand." *Med. Ctr. Pharm. v. Holder*, 634 F.3d 830, 834 n.3 (5th Cir. 2011); *see also Lindquist v. City of Pasadena*, 669 F.3d 225, 239–40 (5th Cir. 2012). The doctrine prevents a party from gaining a second bite at the apple. But the waiver doctrine, like the law-of-the-case doctrine, presupposes that the issue was actually decided. *Med. Ctr. Pharm.*, 634 F.3d at 834. A party cannot forfeit a right to challenge a statement that was never a ruling in the first place. If a finding is dicta, then there was nothing to appeal and nothing to forfeit. *Id.*

The prior judge's Memorandum Opinion addressed plan confirmation in the main bankruptcy case and remaining claims in the adversary proceeding.[134] In the background section, the judge described the drop-down proposal Angelo Gordon, Gamut, and Apollo sent to Serta, certain emails by Excluded Lenders, and the Excluded Lenders' effort to stop the 2020 Transaction. The judge then said that conduct reflected the Excluded Lenders' "objective lack of good faith."[135] Later, in resolving the implied covenant of good faith and fair dealing claim, the judge said the Participating Lenders acted defensively and in good faith and that, on the "scale of equity," it is the conduct of the Excluded Lenders that "raises an eyebrow."[136]

---

[134] Memorandum Opinion, Case No. 23-90020, ECF No. 324 at 1. On plan confirmation, the discussion about good faith was a finding that the solicitation and voting process was in good faith, the plan satisfied 1129(a)(3)'s requirement that a plan be filed in good faith, and that Serta's independent directors exhibited a high level of professionalism. Memorandum Opinion, Case No. 23-90020, ECF No. 324 at 10, 12, 15.

[135] Memorandum Opinion, Case No. 23-90020, ECF No. 324 at 6–7.

[136] Memorandum Opinion, Case No. 23-90020, ECF No. 324 at 16–17.

The Participating Lenders argue these statements are law-of-the-case and should not be relitigated. Arguably these finding could be used to support the Participating Lenders' equitable defenses. But that's wrong. The Participating Lenders' in pari delicto and unclean hands defenses against the Excluded Lenders were litigated in the March 2026 case before this judge. They were not litigated in the first trial. The prior judge's ruling on the implied covenant claim relied primarily on cases holding that the focus was on the plaintiff's reasonable expectations at the time of entry into the agreement, conduct expressly permitted under an agreement does not violate the implied covenant, and actions taken for a legitimate business purpose, even if self-interested, do not violate the implied covenant.[137] The judge held that the parties were sophisticated and knew the Credit Agreement was "loose" and understood the implication of the "looseness." And that the Participating Lenders' actions were taken for a legitimate business purpose and did not violate the implied covenant of good faith and fair dealing.[138] The judge then relied on his prior permissible open market purchase exception finding and affirmed that there was no breach of the Credit Agreement.[139]

The judge's statements about the Excluded Lenders' conduct, including the "objective lack of good faith," could be removed without affecting any ruling on plan confirmation, the implied covenant claim, or the remaining claims asserted against the Participating Lenders. They are non-binding dictum. That means the Excluded Lenders could not have forfeited a right to challenge claims against them raised in a trial three years later about whether the Participating Lenders breached § 2.18(c). And even if required, the Excluded Lenders' notice of appeal to the 5th Circuit also identified the summary judgment order and confirmation order as the orders being challenged.[140] The waiver doctrine does not require a party to appeal every sentence in an opinion to preserve its arguments. It requires a party to appeal adverse rulings. And dicta is not a ruling.

The legal issue presented on remand is whether the Participating Lenders breached § 2.18(c). In this case, the Participating Lenders argue the Excluded Lenders acted in bad faith and the Excluded Lenders were permitted to defend themselves. The Count conducted a trial on the merits and rules on them in this decision. Regardless, as detailed below, even if such findings were binding here, they still don't bar any recovery Plaintiffs are due.

### e. The Participating Lenders Ratification Argument Fails

The Participating Lenders argue that even if § 2.18(c) applies to the 2020 Transaction, the Participating Lenders themselves ratified the transaction as an

---

[137] Memorandum Opinion, Case No. 23-90020, ECF No. 324 at 16.

[138] Memorandum Opinion, Case No. 23-90020, ECF No. 324 at 17.

[139] Memorandum Opinion, Case No. 23-90020, ECF No. 324 at 17.

[140] Joint Notice of Appeal, Adv. ECF No. 331 at 2 (identifying the summary judgment order and the confirmation order as the orders appealed).

open market purchase by amending § 9.05(g) with the consent of a majority of lenders.[141] The Court disagrees.

The ratification theory is not a stand-alone defense. It depends on the premise that § 9.05(g) validly authorized the 2020 Transaction as an open market purchase. And that a majority of lenders thus had something to ratify. The Fifth Circuit, however, rejected that premise. And once § 9.05(g) was held not to apply, any amendment purporting to confirm the validity of the 2020 Transaction had no operative effect on § 2.18(c). In other words, the Participating Lenders did not ratify a permitted transaction. The ratification argument therefore fails for the same reason the open market defense failed.

The Court also notes that this argument is not new. The Participating Lenders made the same argument to the Fifth Circuit in the appeal on the open market issue:

> But to the extent there was any doubt, a majority of Lenders ratified the 2020 Transaction—including its open market purchases—in approving amendments to the 2016 Agreement that confirm the propriety of the Transaction.[142]

The Fifth Circuit rejected this argument and held that the 2020 Transaction did not qualify as an open market purchase under § 9.05(g). *Serta*, 125 F.4th at 579–81. The Circuit also noted that § 9.02(b)(A) generally required unanimous consent of any affected lender "to waive, amend, or modify § 2.18 in any way that would 'alter the pro rata sharing of payments required thereby.'" *Id.* at 567. And that changing or eliminating the ratable-sharing provision under § 2.18 required unanimous consent among lenders "to prevent SSB from repaying one lender to the prejudice of the others, and to prevent a majority of the lenders from bargaining away the ratable-sharing provision that protects all lenders." *Id.*

This Court and the parties are bound by the Fifth Circuit's ruling. The Participating Lenders breached § 2.18(c). Section 9.02(b)(A)(6) of the Credit Agreement prohibited the Participating Lenders from amending § 9.05(g) to include transactions that violated the sacred right of pro rata sharing.[143] The reason is structural. If a majority of lenders could amend the carve-out under § 9.05(g), the protections under § 2.18(c) are illusory. The Fifth Circuit held that unanimous consent was required to prevent a majority of lenders, in this case, from bargaining away protections belonging to all lenders. *Serta*, 125 F.4th at 567. Any theory that depends on § 9.05(g) authorizing the 2020 Transaction is no longer a viable defense

---

[141] March 2, 2026 Tr. 46:19–48:13 (Participating Lenders' opening statement), Adv. ECF No. 716; March 4, 2026 Tr. 46:4–9, (Daniello), Adv. ECF No. 676.

[142] Corrected Brief for Plaintiffs-Appellees Barings, LLC, Boston Management and Research, Credit Suisse Asset Management, LLC, Eaton Vance Management, and Invesco Senior Secured Management, Inc. at 62, Case No. 23-20181, ECF No. 146-1.

[143] Credit Agreement, Debtors' Ex. 6, Case No. 23-90020, ECF No. 853-6.

to a breach claim under § 2.18(c). The ratification argument is the same argument that lost before the Fifth Circuit in new packaging.

### f.        In Pari Delicto/Unclean Hands

The Participating Lenders ask the Court to apply the doctrines of in pari delicto and unclean hands to limit damages. The Excluded Lenders object on two grounds. First, they argue the Participating Lenders should not be permitted to argue in pari delicto because they failed to plead it as an affirmative defense. Second, assuming it applies, the record shows there is no basis to apply them. The Court finds that in pari delicto applies, but the Court won't bar any recovery based on it or the unclean hands doctrine.

Federal Rule of Civil Procedure 8(c) says that in responding to a pleading, "a party must affirmatively state any avoidance or affirmative defense." The Fifth Circuit has interpreted this to mean that defendants must plead affirmative defenses with enough particularity to give plaintiffs "fair notice of the defense that is being advanced" or else the defense is waived. *Rogers v. McDorman,* 521 F.3d 381, 385–86 (5th Cir. 2008) (internal quotation marks and citations omitted). "Where the [affirmative defense] is raised in the trial court in a manner that does not result in unfair surprise, however, technical failure to comply precisely with Rule 8(c) is not fatal." *Id.* A defendant also does not waive an affirmative defense if it is raised at a sufficient time and the plaintiff is not prejudiced in their ability to respond. *Id.* A plaintiff is prejudiced if they were unable to "prepare for and contest the defense." *Id.* at 387. In *Rogers*, the Fifth Circuit found no waiver of an in pari delicto defense when the defendants pled unclean hands and otherwise indicated the plaintiffs' conduct would be at issue in the trial. *Id.*[144]

The Excluded Lenders argue that the Participating Lenders did not plead the affirmative defense of in pari delicto and thus the Court should not evaluate it. The Court disagrees. The Participating Lenders' second affirmative defense states that the "Third-Party Plaintiffs' claims are barred, in whole or in part, by equitable estoppel, waiver, unclean hands, laches, and/or *other equitable doctrines*" (emphasis added).[145] The Participating Lenders have also consistently alleged the Excluded Lenders acted in bad faith for, among other things, sending Serta a drop-down transaction and offering $30 million to stop the 2020 Transaction. In pari delicto comes as no surprise to the Excluded Lenders. Thus, because the Excluded Lenders were aware that their conduct would be in question, the Court does not find that in pari delicto was waived, or that the Excluded Lenders were prejudiced.

---

[144] And while the Federal Rules control, under New York law, in pari delicto may also be raised for the first time on appeal and is equivalent to unclean hands. *Matter of Wimbledon Fin. Master Fund, Ltd. V. Wimbledon Fund, SPC*, 80 N.Y.S.3d 3 (1st Dep't 2018).
[145] Response to Complaint, Adv. ECF No. 217 at 156.

In pari delicto is an equitable remedy under New York law. *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010).[146] The doctrine "bars a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault contributed to the loss." *Rosenbach v. Diversified Group*, 926 N.Y.S.2d 49, 51 (1st Dep't 2011). The doctrine can apply in breach of contract cases. *New Greenwich Litig. Tr., LLC v. Citco Fund Servs. ( Eur.) B.V.*, 41 N.Y.S.3d 1, 4 (1st Dep't 2016) (dismissing claims, including breach of contract, because in pari delicto applied).[147] But courts applying New York law have suggested that the doctrine requires fraud or illegality in the subject contract. *See ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n,* 27 F. Supp. 3d 494, 515 (S.D.N.Y. 2014) (declining to dismiss a breach of contract claim on in pari delicto grounds when "[the contract] does not contemplate or necessarily entail any unlawful conduct and thus is enforceable.")

The doctrine of unclean hands is also an equitable remedy that applies when "the complaining party shows that the offending party is 'guilty of immoral, unconscionable conduct . . . and the party seeking to invoke the doctrine was injured by such conduct.'" *Kopsidas v. Krokos*, 742 N.Y.S.2d 342, 344 (2d Dep't 2002) (citations omitted). The doctrine is, however, unavailable where, as here, the action is exclusively for damages. *See Greco v. Christoffersen*, 896 N.Y.S.2d 363, 366 (2d Dep't 2010); *Manshion Joho Ctr. Co. v. Manshion Joho Ctr., Inc.*, 806 N.Y.S.2d 480, 482 (1st Dep't 2005). Thus, unclean hands doesn't apply here because the Plaintiffs only seek damages based on a breach of contract claim. In pari delicto is, therefore, the only available theory against the Excluded Lenders, and the Court won't limit damages based on it.[148] And even if unclean hands was available here, the Court still would not apply the doctrine.

The Participating Lenders focus on the Excluded Lenders sending Serta a proposed drop-down transaction and the $30 million offer to certain Participating Lenders to abandon their deal with Serta. These actions and similar related acts alleged by the Participating Lenders do not preclude or limit recovery. The drop-down transaction was a proposal sent to Serta. It was never accepted by Serta. One of the Participating Lenders also sent a drop-down proposal to Serta, but Participating Lenders don't mention in pari delicto or unclean hands on this one.[149] The evidence also shows that Serta started a process "to obtain multiple proposals

---

[146] When a case arises under New York law, federal courts apply the state version of the doctrine. *ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n*, 27 F.Supp.3d 494, 515 (S.D.N.Y. 2014).

[147] The Participating Lenders point to *In re Refco Sec. Litig.*, 779 F. Supp. 2d 372, 374 n.1 (S.D.N.Y. 2011) and *Knox v. Countrywide Bank*, 4 F. Supp. 3d 499, 510 (E.D.N.Y. 2014) as examples of courts applying *in pari delicto* under New York law to bar claims for damages. The Court notes that neither case applied the doctrine to a contract claim.

[148] The defenses don't apply to the LCM Lenders because they did not discuss any liability management proposals with Serta and they were never contacted about potential liability management exercises by other lenders. March 3, 2026 Tr. 267:10–268:1–4 (Tavangar), Adv. ECF No. 677.

[149] March 4, 2026, Tr. 180:5–184:10 (Searles), Adv. ECF No. 676.

for any transaction and enable a competitive process to obtain the best terms available for the company."[150] Serta was the one who ultimately had the Excluded Lenders and the Participating Lenders bidding against each other and placed parties under NDAs. There is also no meaningful evidence that Serta's finance committee would have voted to accept such a proposal. There also isn't any evidence that the Excluded Lenders were acting in bad faith by offering money to the Participating Lenders stop the 2020 Transaction from closing.[151] The record reflects that cash was offered, at least in part, to pursue a pro rata transaction.[152] The Participating Lenders also ignore that when they learned about a potential drop-down transaction, they wrote a letter to the Administrative Agent to stop such a transaction and said they were prepared to exercise their rights to do so too.[153]

Based on the record, the Court finds that acts relating to submitting a proposal that was never accepted, which was followed by Serta creating a competitive bidding process, or offering millions to stop a deal, and other related prepetition behavior by the Excluded Lenders does not rise to in pari delicto or unclean hands (even if it applied) in this case. Based on the record, there was no injury to the Participating Lenders caused by any intentional wrongdoing or immoral/unconscionable conduct, which the Court doesn't find either. There was also no requisite level of equal fault required for in pari delicto.

The Court understands that the Participating Lenders believe they had to act defensively when they learned about the proposed drop-down transaction. And that they believe the 2020 Transaction helped Serta and all creditors. But it just doesn't change the answer in this case. In the end, Plaintiffs are entitled to damages for a simple reason: the 2020 Transaction was not a permissible open-market purchase. And, as a result, the Participating Lenders breached § 2.18(c).

### g.    Duty to Mitigate

The Participating Lenders also raise a failure-to-mitigate defense. They argue the Plaintiffs should have sold their First Lien Term Loans on the secondary market after the 2020 Transaction rather than holding them through a sustained decline in value. The Participating Lenders, however, did not carry their burden, and the record shows why: there was no meaningful market for Plaintiffs to sell their positions, and no real offers to buy their debt. And selling also meant they would forfeit the right to assert breach of contract claims against the Participating Lenders. Thus, the Court finds no reduction in damages is warranted based on a failure to mitigate.

---

[150] March 5, 2026, Tr. 2:1–12:25 (Shah), Adv. ECF No. 717, Case No. 23-90020, ECF No. 822-7.

[151] In fact, Roopesh Shah testified that there is "inherently nothing nefarious" about a lender seeking to maximize their recovery. March 5, 2026 Tr. 50:16–18 (Shah), Adv. ECF No. 717.

[152] Debtors' Ex. 212, Case No. 23-90020, ECF No. 865-5.

[153] March 4, 2026 Tr. 73:13–75:16 (Daniello), Adv. ECF No. 676.

The duty to mitigate requires that a plaintiff take reasonable steps to limit losses. *Wilmot v. State*, 32 N.Y.2d 164, 166 (1973). If a party fails to mitigate, any award of damages may be reduced "by any unnecessary increase in damages due to the failure of the plaintiff to avoid them." *US W. Fin. Servs., Inc. v. Marine Midland Realty Credit Corp.,* 810 F. Supp. 1393, 1402 (S.D.N.Y. 1993) (quoting *Golbar v. Props. Inc. v. N. Am. Mort. Invs.*, 431 N.Y.S.2d 820, 822 (1st Dep't 1980)). Reasonableness is measured at the time the plaintiff acted, not with the benefit of hindsight, and the duty does not extend to extraordinary or costly measures. *Carrols Equities Corp. v. Villnave*, 395 N.Y.S.2d 800, 803 (4th Dep't 1977). A plaintiff who suffers damages from another's wrongful conduct cannot simply hold securities indefinitely; the plaintiff must take reasonable steps to minimize losses. *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985). A plaintiff who declines reasonable offers to sell "in effect makes a new investment decision as to which he or she must suffer the consequences." *Drummond v. Morgan Stanley & Co.*, No. 95 Civ. 2011 DC, 1996 WL 631723, at *2 (S.D.N.Y. Oct. 31, 1996).

But a plaintiff need not surrender a right of substantial value to minimize loss. *Levantino v. Ins. of N. Am.*, 422 N.Y.S.2d 995, 1002 (Sup. Ct. 1979); *In Time Prods., Ltd. v. Toy Biz, Inc.*, 38 F.3d 660, 665 (2d Cir. 1994). A party need not accept a compromise that forces it to give up a material contract right. *Id.* Instead, "the 'appropriate inquiry' is whether plaintiffs' decisions were 'reasonable in light of the circumstances when they made their decisions,' not whether it can be later shown that a course of action would have been more successful.'" *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-04394 (AJN) (BCM), 2016 WL 4613390, at *19 (S.D.N.Y. Aug. 31, 2016).

The burden here lies with the Participating Lenders. *Olin Corp. v. Lamorak Ins.*, 332 F. Supp. 3d 818, 856 (S.D.N.Y. 2018). They must show that the Excluded Lenders acted unreasonably and that specific, identifiable steps would have reduced the harm. *LaSalle Bank N.A. v. Nomura Asset Cap. Corp.*, 899 N.Y.S.2d 15, 17–18 (1st Dep't 2010) ("[I]t remains defendants' burden to prove whether reasonable mitigation measures would have reduced plaintiff's damages and by how much."). The Participating Lenders' mitigation arguments came principally through the expert testimony of Yvette Austin. Austin opined that the Excluded Lenders "had opportunities to sell their holdings in the [FLTLs] . . . at prices near, or exceeding the exchange ratios in the June 2020 Transactions" of approximately 74 cents on the dollar.[154] She also opined that, by signing a cooperation agreement in September 2020, certain Excluded Lenders voluntarily restricted their sales and failed to capture available economic value that would have mitigated their damages.[155]

Austin's posits several theories. First, she pointed to London Stock Exchange indicative pricing data showing quoted prices for the First Lien Term Loans at or

---

[154] March 5, 2026 Tr. 98:3–8 (Austin), Adv. ECF No. 717.
[155] March 5, 2026 Tr. 98:15–99:5 (Austin), Adv. ECF No. 717.

above 74 cents on the dollar through portions of 2021, and concluded from those quotes that the Excluded Lenders could have sold at the midpoint of the indicated bid-ask spread.[156] Second, Austin testified that up to $186 million in face value of First Lien Term Loans traded between the June 2020 Transaction and December 31, 2021.[157] In her view, this showed a functioning market into which the Excluded Lenders could have sold their loans.[158] Using this data, Austin constructed two "but-for" mitigation scenarios in which the Excluded Lenders would have sold incremental volumes equal to roughly 29% to 43% of total observed trading activity, yielding hypothetical mitigation sales of approximately $62 million to $94 million.[159] Third, she relied on a series of Bloomberg chat exchanges that she opines demonstrated both market interest in the First Lien Term Loans and the Excluded Lenders' awareness of sales opportunities they declined to pursue.[160]

There are many chats, but here are a few:

- A follow-up May 2021 chat in which Amy Silverzweig (Barclays)—the lead market maker for Serta debt—outlined a detailed sale-process roadmap ("You build a data site. You educate people. U say you have the mandate. . . . And people spend the time"), to which Rachel Epstein (Apollo) replied, "Thanks, Amy. Those are helpful suggestions."[161]

- A June 17, 2021 internal Angelo Gordon chat in which a partner wrote, "I know we're not going to execute on Serta . . . but that's a 6 hundy axe."[162]

Austin's analysis was admittedly not grounded in what actually occurred. She acknowledged that she did not, for example, "have a fact pattern that says if the AG group sold, then, for example, Z Capital would not have sold." Her analysis also assumed the Excluded Lenders' hypothetical sales would have been incremental to actual trades.[163] The parties also disagreed about the meaning of "hundy axe." Nobody presented a definitive answer. Both parties speculated. It remains unclear.

The Participating Lenders also rely on cases like *Drummond v. Morgan Stanley & Co.* in support of their mitigation argument, but it does not help them. *Drummond*, for example, involved a plaintiff who declined an existing offer to purchase securities. *Drummond*, 1996 WL 631723, at *2. The court held that declining such an offer constituted a new investment decision, which presupposes a

---

[156] March 5, 2026 Tr. 98:3–10 (Austin), Adv. ECF No. 717 (relying on indicated bid and ask data published by LSEG).

[157] March 5, 2026 Tr. 108:19-109:4 (Austin), Adv. ECF No. 717.

[158] March 5, 2026 Tr. 101:3-14 (Austin), Adv. ECF No. 717.

[159] March 5, 2026 Tr. 104:11–107:24 (Austin), Adv. ECF No. 717.

[160] March 5, 2026 Tr. 143:11–144:5 (Austin), Adv. ECF No. 717.

[161] DX1284, Adv. ECF No. 588-98; PTL Ex. No. 252, Adv. ECF No. 587-36.

[162] PTL Ex. No. 253, Adv. ECF No. 587-37.

[163] March 5, 2026 Tr. 143:11–25 (Austin), Adv. ECF No. 717.

concrete opportunity that the plaintiff chose to pass up. The trial record here, however, does not establish that Excluded Lenders received and rejected bona fide offers.

The Court found the rebuttal expert testimony of Marti P. Murray, and the testimony of the Excluded Lenders' and the LCM Lenders more persuasive. They established that there was no real market to mitigate losses into and that the lack of market depth was confirmed by Excluded Lenders' efforts to sell after the 2020 Transaction. Murray's main point was that the London Stock Exchange data Austin relied on was unsuited to support a mitigation defense, because it does not represent actual trades or firm bids.[164] Asked whether market participants can transact at indicated quoted prices, Murray explained "[T]hat's just an indication. That doesn't mean you can necessarily trade there."[165]

Murray also testified that, even on the corrected trade-data figures, the actual market could not have absorbed the Excluded Lenders' position.[166] The Plaintiffs held over $700 million face amount of First Lien Term Loans. In the entire eighteen-month period from the 2020 Transaction through December 31, 2021, only $162 million in aggregate face amount traded. This was across 71 trades, with an average trade size of $2.3 million and only five trades of $5 million or larger.[167] Murray also testified that entry of a sophisticated, large-block seller like Apollo or Angelo Gordon "could have scared people off, and it could have made any potential buyers step back."[168]

Murray also pointed to dealer behavior as confirmation that demand was thin. UBS records show that during the relevant period, dealers accumulated about $44 million face amount of First Lien Term Loans on a net basis—meaning they were sitting on First Lien Term Loans inventory they could not move.[169] Murray testified that disposing a position the size of the Excluded Lenders "would be a substantial and burdensome process akin to selling a company rather than a batch of loans[170] Austin agreed.[171]

The Excluded Lenders' fact witnesses corroborated Murray's analysis and established that they tried to sell, but couldn't find buyers. Angelo Gordon's representative, Jacob Gladstone, testified that the firm had "conversations weekly or at least biweekly with various brokers," and that those conversations were always left with "if you do have a buyer for Serta, let us know." The brokers never brought them a buyer.[172] In July 2021, after First Lien Term Loan prices recovered

---

[164] Murray Report ¶ 190, Adv. ECF No. 663-1.
[165] March 6, 2026 Tr. 12:14–25 (Murray), Adv. ECF No. 679.
[166] March 6, 2026 Tr. 19:4–23:15 (Murray), Adv. ECF No. 679.
[167] March 6, 2026 Tr. 48:12–15 (Murray), Adv. ECF No. 679.
[168] March 6, 2026 Tr. 23:12–24:3 (Murray), Adv. ECF No. 679.
[169] March 6, 2026 Tr. 32:12–20, 33:14–25 (Murray), Adv. ECF No. 679.
[170] March 6, 2026 Tr. 41:23–42:6 (Murray), Adv. ECF No. 679.
[171] March 5, 2026 Tr. 159:1–5 (Austin), Adv. ECF No. 717.
[172] March 3, 2026 Tr. 50:5–25 (Hanigan), Adv. ECF No. 677.

into the upper 70s and Angelo Gordon believed the position might be saleable, the firm engaged Credit Suisse's Private Credit Group. But no sales were completed.[173]

Gamut's representative, Michael Hanigan, testified that the firm had either weekly or at least biweekly conversations with brokers.[174] The conversations with brokers involved questions like: are there trades that you're seeing?, do you have buyers?, and if you do have a buyer, let us know.[175] Despite these efforts, there was never a buyer.[176]

Apollo's representative, Theodore Kwon, testified that the firm evaluated the holding-versus-selling question many times in dialogue with its trading desk, and that "every time [they] talked to them, there was no market."[177] Kwon said Apollo held $192 million in face value—which meant they were a large seller—but they were unable to find a buyer or series of buyers who could take on so much debt.[178] Kwon also explained that an incremental drip-sale strategy would have depressed the price.[179]

There is another problem with the Participating Lenders' theory: the Plaintiffs may also not be required to abandon their claims. *Levantino*, 422 N.Y.S.2d at 1002. If Plaintiffs had sold their First Lien Term Loans after the 2020 Transaction under the terms required under the Credit Agreement, the purchasers would have acquired the right to assert the same breach-of-contract claims now at issue. *Durham*, 76 N.Y.S.3d at 695. Recall also that the 2020 Transaction provided for more potential liability management deals that could have further subordinated First Lien Term Loans.[180]

And for the LCM Lenders, the 2020 Transaction was not simply an adverse market development but a direct challenge to the senior-secured-lending model on which its business depends. The LCM Lenders held their positions because the right to litigate the breach claim was, for them, more valuable than any sale price the secondary market could offer—and because the LCM Lenders understood that selling would extinguish its right to bring their breach of contract claim. For the LCM Lenders, the 2020 Transaction was an existential threat to its business, and the broader market for senior secured lending as a whole.[181] The mitigation doctrine

---

[173] March 3, 2026 Tr. 130:1–131:7, 150:2–6 (Gladstone), Adv. ECF No. 677 ("Credit Suisse identified, I want to say, 10 to 12 parties who they thought might have been interested. And ultimately, we were not successful in finding anybody who wanted to purchase it.")

[174] March 3, 2026 Tr. 50:2–10 (Hanigan), Adv. ECF No. 716.

[175] March 3, 2026 Tr. 50:15–19 (Hanigan), Adv. ECF No. 716.

[176] March 3, 2026 Tr. 50:20–21; 51:17–23 (Hanigan), Adv. ECF No. 716.

[177] March 2, 2026 Tr. 313:1–315:25 (Kwon), Adv. ECF No. 716.

[178] March 2, 2026 Tr. 283:8–12 (Kwon), Adv. ECF No. 716.

[179] March 2, 2026 Tr. 316:17–22 (Kwon) Adv. ECF No. 716 ("Because if you're doing that, one, you would be depressing the [price]. And two, if you're selling these loans out in the market and leaking it out, you are further exposing yourself for every single trade that you do.").

[180] March 3, 2026 Tr. 142:16–19 (Gladstone), Adv. ECF No. 677.

[181] March 3, 2026 Tr. 273:21–275:16 (Tavangar), Adv. ECF No. 677.

does not require a plaintiff to abandon a claim it regards as existential to spare the breaching party a portion of the damages its breach caused. The Participating Lenders did not carry their burden. The Court rejects the failure to mitigate defense.

### h.    Damages

Under New York law, "[O]ne who violates his contract with another is liable for all the direct and proximate damages which result from the violation." *Wakeman v. Wheeler & Wilson Mfg. Co.,* 4 N.E. 264, 266 (N.Y. 1886); *see also Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (applying New York law). Damages must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes. *Wakeman*, 4 N.E. at 266. The theory underlying breach of contract damages "is to make good or replace the loss caused by the breach." *iGo Mktg. & Entm't, LLC v. Hartbeat Prods., LLC,* 191 N.Y.S.3d 646, 648 (2d Dep't 2023). Thus, damages should "return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed." *Id.* (citing *Goodstein Const. Corp. v. City of New York*, 80 N.Y.2d 366, 373 (1992)).

The Plaintiffs retained Louis Dudney to calculate damages arising from the breach of § 2.18(c). The Participating Lenders offered the expert testimony of Yvette Austin to rebut Dudney's report and to opine on certain aspects of Dudney's methodologies.[182]

### i.    Dudney

Dudney calculated that there was about $1.887 billion in aggregate face value of First Lien Term Loans outstanding under the Credit Agreement before the 2020 Transaction. The Participating Lenders held about $992 million, representing about 52.6% of the total outstanding First Lien Term Loan class. Plaintiffs held the remaining $895 million, representing about 47.4% of the class.[183]

At counsel's instruction, Dudney focused his analysis exclusively on the first-lien debt component of the 2020 Transaction. In the 2020 Transaction, the Participating Lenders exchanged all $992 million of their First Lien Term Loans for about $734 million in face value of new First Lien, Second Out super-priority loans at an exchange ratio of $0.74 per dollar of First Lien Term Loan principal.[184] This

---

[182] Mar. 2, 2026 Tr. 69:14–21 (Dudney), Adv. ECF No. 716; Mar. 5, 2026 Tr. 70:8–16 (Austin), Adv. ECF No. 717.

[183] Mar. 2, 2026 Tr. 97:14–25 (Dudney), Adv. ECF No. 716.

[184] Mar. 2, 2026 Tr. 87:16–22 (Dudney), Adv. ECF No. 716; Exchange Agreement § 2.1(a), DX0547, Adv. ECF No. 581-66.

exchange ratio reflects the 26-cent discount the Participating Lenders accepted on their First Lien Term Loan principal as part of the negotiated transaction terms.[185]

A core assumption underlying Dudney's methodologies, provided at counsel's instruction, is that § 2.18(c) requires sharing ratably in accordance with the total amount of principal of and accrued interest on the respective First Lien Term Loan.[186] Thus, the Credit Agreement required the Participating Lenders to make an immediate cash payment representing the Plaintiffs' pro rata share of the $734 million First Lien Second Out face value received by the Participating Lenders. The ratable share is calculated across the entire Class—$1.887 billion.[187]

Dudney then assumes that the payment obligation under § 2.18(c) would have been carried out through a cash purchase of participations of $348 million of the Plaintiffs' existing First Lien Term Loans.

The math works like this:

| Total First Lien Second Out consideration received by Participating Lenders | $734,000,000 |
|---|---|
| Total first-lien class outstanding (stipulated) | $1,887,000,000 |
| Plaintiffs' first-lien holdings (stipulated) | $895,000,000 |
| Plaintiffs' proportionate class share | $895M / $1,887M = 47.43% |
| **Plaintiffs' ratable share of $734M payment** | **$734M × 47.43% = $348M** |

Dudney then offers two methodologies for calculating damages, each departing from the $348 million baseline in a different direction.

**First Methodology—Time of Emergence.** Dudney's first methodology measures damages as of June 29, 2023, the date Serta emerged from bankruptcy. Dudney calculates the value the Plaintiffs would have held had they received their pro rata share of consideration in June 2020 and compared it to the Plaintiffs' actual recovery under Serta's chapter 11 plan.[188] The result was a damages estimate ranging between $240 million to $296 million before prejudgment interest,

---

[185] Mar. 2, 2026 Tr. 102:15–22 (Dudney), Adv. ECF No. 716; Exchange Agreement § 2.1(a), DX0547, Adv. ECF No. 581-66.

[186] Mar. 2, 2026 Tr. 83:18–84:10 (Dudney), Adv. ECF No. 716.

[187] Mar. 2, 2026 Tr. 97:14–98:7 (Dudney), Adv. ECF No. 716.

[188] Mar. 2, 2026 Tr. 88:18–89:14; 91:1–25 (Dudney), Adv. ECF No. 716.

depending on assumptions about First Lien Second Out value at issuance and actual recoveries at emergence.[189] The Court rejects this methodology.

New York courts generally calculate damages as of the breach date. *Simon v. Electrospace Corp.,* 269 N.E.2d 21, 26 (N.Y. 1971); *Kaminsky v. Herrick, Feinstein LLP*, 870 N.Y.S.2d 1, 11–12 (1st Dep't 2008). Based on applicable New York law, the Court similarly finds that damages must be calculated as of the time of breach only. Serta emerged from bankruptcy in June 2023, which is about three years after the 2020 Transaction. Based on the record, proximate causation is too speculative considering independent market forces like a broad downturn in the mattress industry driven by COVID-era demand, and Serta's inability to refinance its capital structure in early 2022. Time of breach is also consistent with the pro rata treatment and timing of payment required under § 2.18(c).[190]

**Second Methodology — Time of Breach.** Dudney's time of breach methodology valued the Plaintiffs' lost opportunity as of June 22, 2020, using market prices for the First Lien Term Loan and First Lien Second Out paper prevailing around the time of closing.[191] His calculation starts with $348 million as the cash obligation the Participating Lenders failed to pay.[192] Dudney then compares what he opines the Plaintiffs would have received (the "but/for world") versus what they received in the 2020 Transaction. In the but/for world, Dudney opines that the Plaintiffs would have, after receiving ratable distributions, (i) sold participations in $348 million (38.9%) of their $895 million in aggregate First Lien Term Loan face value to the Participating Lenders and (ii) retained their remaining $546.83 (61.1%) of $895 million First Lien Term Loan face value. The remaining $546.83 is then discounted using a range of market prices: including $0.31 after the release of the transaction structure and Serta's cleansing disclosures and $0.25 as of the actual closing.[193] Dudney also uses $.10, which was based on an S&P report providing a value in 2020 about potential payouts in a hypothetical bankruptcy case.[194] In Dudney's actual world analysis, the Plaintiffs retained the $895 million First Lien Term Loans after the 2020 Transaction. Applying the same indications of potential market value, the actual world values range between $89.5 and $277.45 million. The total damages are calculated as the delta between the but-for world and the actual world, resulting in estimates ranging between $240.24 to $313.36 million.[195]

---

189 Mar. 2, 2026 Tr. 89:15–90:1-17 (Dudney), Adv. ECF No. 716.

190 The speculative problems and a-textual considerations in Plaintiffs' time of emergence are like the problems the Court has with the Participating Lenders' expert's effort to minimize damages through an expanded reading of "benefit" under § 2.18(c).

191 Mar. 2, 2026 Tr. 89:1–14, 101:3–102:5 (Dudney), Adv. ECF No. 716.

192 Mar. 2, 2026 Tr. 98:8–25 (Dudney), Adv. ECF No. 716.

193 Mar. 2, 2026 Tr. 95:8–96:17 (Dudney), Adv. ECF No. 716.

194 Mar. 2, 2026 Tr. 167:8–170:10 (Dudney), Adv. ECF No. 716.

195 Mar. 2, 2026 Tr. 101:19–102:5, 104:16–105:25, 118:1–9 (Dudney), Adv. ECF No. 716.

For ease of reference, below is a chart summarizing Dudney's time of breach calculations:[196]

| But/For World | | | | | |
|---|---|---|---|---|---|
| **Item/Component** | **$0.10** | **$0.15** | **$0.20** | **$0.25** | **$0.31** |
| [A] But-for cash payment | $348.17 | $348.17 | $348.17 | $348.17 | $348.17 |
| [B] FLTL retained $546.83M | $546.83 | $546.83 | $546.83 | $546.83 | $546.83 |
| | | | | | |
| [C] FLTL market price | $0.10 | $0.15 | $0.20 | $0.25 | $0.31 |
| [D] Value of retained FTLs [B×C] | $54.68 | $82.02 | $109.37 | $136.71 | $169.52 |
| | | | | | |
| [E] But-for world total [A+D] | $402.86 | $430.20 | $457.54 | $484.88 | $517.69 |
| [F] Actual world FLTLs | $895.00 | $895.00 | $895.00 | $895.00 | $895.00 |
| [G] Actual world value [F×C] | $89.50 | $134.25 | $179.00 | $223.75 | $277.45 |
| | | | | | |
| **Damages [E−G]** | **$313.36** | **$295.95** | **$278.54** | **$261.13** | **$240.24** |

---

[196] Mar. 2, 2026 Tr. 95:25–96:17 (Dudney), Adv. ECF No. 716.

### ii.     Austin

Austin evaluated and critiqued Dudney's damages methodologies. She also offered alternative damages methodologies demonstrating that the Plaintiffs are entitled to no compensable damages or, at most, about $46.1 million after correcting certain errors in Dudley's time of breach methodology.[197]

Austin critiques Dudney's foundational assumption that § 2.18(c) required the Participating Lenders to pay Plaintiffs $348 million. Austin believes the assumption conflates face value with economic value.[198] That is because the Participating Lenders did not receive $734 million in cash or, in her opinion, $734 million in economic value. They received First Lien Second Out debt with a face value of about $734 million, only after surrendering $992 million in First Lien Term Loan principal. The First Lien Second Out debt was newly created paper in a distressed borrower with material execution risk. It was not worth face value at issuance.[199] According to Austin, treating First Lien Second Out face value as equivalent to a cash payment of that amount overstates the "benefit" received by the Participating Lenders and inflates any damages figure.

Austin also notes that § 2.18(c) required purchasing participations "for Cash at face value" in the other lenders' existing loans, but did not require paying a cash sum equal to the First Lien Second Out face value. The Plaintiffs' First Lien Term Loans were trading at roughly $0.42 before announcement of the 2020 Transaction. And a participation purchased at face value in a loan trading at $0.42 would immediately be worth less than the purchase price, creating an economically senseless obligation.[200] Austin believes Dudney did not engage with this asymmetry. Nor did Dudney consider the benefits of the 2020 Transaction for Serta, such as the injection of $200 million of new money and reduced debt, which accrued to all creditors.[201]

Austin focuses heavily on the alleged "benefit" received under the 2020 Transaction. The benefit is analyzed as the change in expected recoveries on Serta debt held by all first-lien lenders across the period spanning Q1 2020 through Q3 2020.[202] According to Austin, this window captures the direct economic effects of the 2020 Transaction without incorporating later market movements driven by unrelated macroeconomic forces.[203]

Under this framework, Austin opines that the right question to ask is whether the 2020 Transaction created an economic benefit for the Participating

---

[197] Mar. 5, 2026 Tr. 90:5–24, 92:2–17 (Austin), Adv. ECF No. 717.

[198] Mar. 5, 2026 Tr. 80:22–81:19, 147:7–148:22 (Austin), Adv. ECF No. 717.

[199] Mar. 5, 2026 Tr. 80:22–81:19 (Austin), Adv. ECF No. 717.

[200] Mar. 5, 2026 Tr. 148:7–22, 153:12–154:22 (Austin), Adv. ECF No. 717.

[201] Mar. 5, 2026 Tr. 74:13–75:16, 81:14–19 (Austin), Adv. ECF No. 717.

[202] Mar. 5, 2026 Tr. 91:1–14 (Austin), Adv. ECF No. 717.

[203] Mar. 5, 2026 Tr. 91:1–14 (Austin), Adv. ECF No. 717.

Lenders that the Plaintiffs did not share. If all lenders experienced an improvement in expected recoveries after the 2020 Transaction, and if the Plaintiffs' improvements were proportionate to or greater than their pro rata class share of the total benefit, then there is no net benefit to reallocate under § 2.18(c) and damages are zero.[204] The Court does not accept this methodology because it is not rooted in § 2.18(c). Section 2.18(c) focuses on the benefit of the payment, not benefits of the 2020 Transaction.

> "the Lender receiving such greater proportion ***shall purchase (for Cash at face value) participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of all such payments*** shall be shared by the Lenders of such Class ratably . . ."[205]

Thus, consideration of benefits, such as (i) the $200 million cash in consideration of super-senior First Lien First Out Loans, (ii) the exchange of the Second Lien loans governed under a separate agreement, (iii) Serta's buyback's of Second Lien debt, (iv) the likelihood of Serta filing for bankruptcy in 2020, (v) the price at which lenders purchased First Lien Term Loan debt, or (vi) allocations from an economic perspective are all a-textual considerations.[206]

Austin's second method relies on observed changes in quoted market prices for Serta's first-lien debt from the first quarter to the third quarter of 2020 to calculate the benefit that would need to be shared. Austin measured the "benefit" by comparing each party's expected recovery in the first quarter of 2020—before the 2020 Transaction—to the third quarter of 2020, when the Transaction's results were announced and could be priced into the market. But again, § 2.18(c) imposed a specific cash payment obligation measured at face value. That obligation is not reduced by the residual market value of the Plaintiffs' existing loans.

Austin's methodology also measures market price changes in the overall first-lien debt rather than the specific economic harm of being excluded from the 2020 Transaction. She also relies on distressed-market price quotes from a period of an unusually wide bid-ask spread and limited trading volume, the reliability of which is contested.

And her Q1-to-Q3 2020 measurement window is her own selection, untethered to any contractual provision. And she made no adjustment for independent macroeconomic forces—including federal COVID stimulus payments between 2020 and 2021—that contributed to Serta's improved performance. She

---

[204] Mar. 5, 2026 Tr. 90:5–24 (Austin), Adv. ECF No. 717.
[205] Credit Agreement § 2.18(c), Debtors' Ex. 6, Case No. 23-90020, ECF No. 853-6.
[206] *See generally* March 5, 2026 Tr. 169:1–195:25 (Austin), Adv. ECF No. 717.

confirmed at trial that she saw no need to account for those forces.[207] Also, measuring the alleged benefits of the 2020 Transaction as a whole is not what § 2.18(c) requires. The Participating Lenders compound the error by reading "to the extent necessary" in § 2.18(c) to authorize equitable adjustments of the kind Austin employs, invoking an LSTA model credit agreement as support. Section 2.18(c) is a payment-sharing provision, not a means to evaluate the economics of a transaction after the fact.

Austin's raised interesting challenges to Dudney's work. But the Court will not consider a-textual considerations. Section 2.18(c) says what it says and must be applied on its terms.

### iii.    Damages Calculation

Section 2.18(c) operates in two parts. The first part identifies the trigger: a lender receiving "payment of a greater proportion" of principal or interest than other lenders of the same class. The second part specifies the remedy: the favored lender "shall purchase (for Cash at face value) participations in the Loans of other Lenders of such Class to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably."[208] The operative phrase is "to the extent necessary so that the benefit of all such payments shall be shared ratably." The cash purchase at face value is the mechanism. Ratable sharing of the benefit is the objective. The extent of the required payment is determined by what is necessary to achieve that objective across the class.

Dudney is right that the benefit received by the Participating Lenders was $734 million of First Lien Second Out consideration. This amount is the face value of the consideration the Participating Lenders negotiated and accepted.

The Participating Lenders argue that the $734 million figure cannot be used as a measure of the benefit because no secondary market existed for the First Lien Second Out paper at issuance, making any valuation of that consideration speculative. The Court disagrees. The absence of a secondary market for newly issued paper does not render the face value of the consideration speculative.

Under New York law, where a contract specifies the value of the consideration exchanged, that contractual price is the appropriate basis for calculating damages, and where market value cannot be readily discerned, a factfinder may determine hypothetical market value based on expert testimony or the price offered in the contract. *Credit Suisse First Boston v. Utrecht-America Fin. Co.*, 923 N.Y.S.2d 482, 483 (1st Dep't 2011); *Euro Pac. Cap., Inc. v. U.S. China Mining Grp., Inc.*, No. 15-CV-4636, 2017 WL 89023, at *4 (S.D.N.Y. Dec. 15, 2016) (applying New York law). And any uncertainty about the amount of damages does not bar recovery when the fact of damage is established. *Wakeman*, 4 N.E. at 266.

---

[207] March 5, 2026 Tr. 173:18–174:22 (Austin), Adv. ECF No. 717.
[208] Credit Agreement § 2.18(c), Debtors' Ex. 6, Case No. 23-90020, ECF No. 853-6.

42 / 48

The Court is applying the face value of the consideration that the Participating Lenders themselves negotiated and accepted as the exchange ratio for their First Lien Term Loans. The contract price and support from expert testimony provide the answer here. It is a sound foundation for the damages calculation. *See Coniber v. Ctr. Point Transfer Station, Inc.*, 27 N.Y.S.3d 763, 767 (4th Dep't 2016).

Here is another way to reach the same answer. The class across which that benefit was required to be shared ratably was the total outstanding first-lien principal of $1.887 billion. No other inputs are arguably required. The ratable benefit per dollar of class principal is therefore:[209]

| | |
|---|---|
| **Total benefit received (FLSO face value)** | **$734,000,000** |
| Total first-lien class outstanding (stipulated holdings) | $1,887,000,000 |
| **Ratable benefit per dollar of class principal** | **$0.389** |

Every lender in the first-lien class was entitled to $0.389 per dollar of their principal holdings as the ratable share of the $734 million benefit. The Participating Lenders received $0.74 per dollar on their $992 million of holdings, which is above the ratable rate. The Plaintiffs received nothing. The Participating Lenders owed the Plaintiffs the difference between $0.389 and $0.00, applied to their First Lien Term Loan holdings. The arithmetic to ensure the $734 million benefit is fully distributed is: Participating Lenders retain $992M / $1,887M × $734M = $386 million as their own ratable share; and the Plaintiffs receive $895M / $1,887M × $734M = $348 million. No dollar is counted twice. No party receives more than the total benefit paid.

Using $348 million as the base participation, Dudney's but/for v. actual world analysis is accepted using the $.25 pricing for the First Lien Term Loans because that was the pricing on the closing date of the 2020 Transaction.[210] For ease of reference, below is a chart summarizing Dudney's time of breach calculation:[211]

---

[209] Credit Agreement § 2.18(c), Debtors' Ex. 6, Case No. 23-90020, ECF No. 853-5; Mar. 2, 2026 Tr. (Dudney) at 97:15–98:25, Adv. ECF No. 716.

[210] Mar. 2, 2026 Tr. 96:4–17 (Dudney), Adv. ECF No. 716.

[211] Mar. 2, 2026 Tr. 95:25–96:17 (Dudney), Adv. ECF No. 716.

| Item/Component | $0.25 |
|---|---|
| [A] But-for cash payment | $348.17 |
| [B] FLTL retained $546.83M | $546.83 |
| [C] FLTL market price | $0.25 |
| [D] Value of retained FTLs [B×C] | $136.71 |
| [E] But-for world total [A+D] | $484.88 |
| [F] Actual world FLTLs | $895.00 |
| [G] Actual world value [F×C] | $223.75 |
| **Damages [E−G]** | **$261.13** |

Dudney's calculation adheres to the text of § 2.18(c), which requires purchasing participations (*i.e.*, economic interests) in the First Lien Term Loans. Thus, expert testimony and the contract price provide the calculation of damages here.

The Participating Lenders argue this result makes no economic sense. It requires the Participating Lenders to pay $348 million for a participation arguably worth $87 million at the closing date ($348 million x $.25 closing trading price of First Lien Term Loan). And that no rational party at the time of the breach would agree to that deal.

But here is where the Participating Lenders' argument fails. The Participating Lenders and Serta structured a transaction that always had a risk of not complying with § 2.18(c), which means that having to pay face value for participations in distressed First Lien Term Loans to the Plaintiffs was always a possibility. The 2020 Transaction was structured to use the open market purchase

exception under § 9.05(g) and parties proceeded without complying with § 2.18(c).[212] Sophisticated parties accepted the litigation risk that came with it. And it almost worked. They litigated that risk successfully in New York state court and bankruptcy court. But the Fifth Circuit ultimately held the transaction was not an open market purchase. The result of the decision is that, based on the record and applicable law, § 2.18(c) now applies. Damages viewed from that perspective is not absurd. It is what § 2.18(c) was designed to protect. Strict textual analysis was required to determine whether the 2020 Transaction complied with the Credit Agreement as an open market purchase without triggering any sacred rights. Now the text must be strictly applied when assessing damages.

### i.    Prejudgment Interest

The Credit Agreement says that any claim or dispute arising under or related to the Credit Agreement shall be governed by, and construed and interpreted in accordance with, New York law.[213] Prejudgment interest in New York is 9.00% per annum[214] and it is governed by N.Y. C.P.L.R. § 5001. Section 5001(a) says that prejudgment interest on damages awarded on a breach of contract claim is mandatory:

> *Interest shall be recovered upon a sum awarded because of a breach of performance of a contract . . .* except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.[215] (emphasis added)

Thus, a plaintiff who prevails on a breach of contract claim is entitled to prejudgment interest as a matter of right. *See, e.g., U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991) (applying New York state law); *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 262 (1998) (prejudgment interest is mandatory); *Spodek v. Park Prop. Dev. Assocs.*, 733 N.Y.S.2d 674, 676 (2001) (same). Prejudgment interest under New York law is a part of the damages claim. Its purpose under New York law "is to make an aggrieved party whole." *See City of Birmingham v. Serafini*, 778 N.Y.S.2d 547, 549 (3d Dep't 2004). It is not a penalty but "the cost of having the use of another person's money for a specified period" and is "intended to indemnify successful plaintiffs for the nonpayment of what is due to them." *Love v. State*, 577 N.Y.S.2d 359, 361 (1991); *see also Spodek,* 733 N.Y.S.2d at 676 (a party who "actually had the use of the money, has presumably used the money to its benefit and, consequently,

---

[212] Exchange Agreement, DX0547, Adv. ECF No. 581-66 at 2. The Exchange Agreement recitals stated that § 2.18(c) would not apply to payments made as consideration for the assignment of existing First Lien Term Loans or Second Lien Term Loan under § 9.05(g).
[213] Credit Agreement § 9.10, Debtors' Ex. 6, Case No. 23-90020, ECF No. 853-6.
[214] N.Y. C.P.L.R. § 5004.
[215] N.Y. C.P.L.R. § 5001(a).

has realized some profit, tangible or otherwise, from having it in hand during the pendency of the litigation. There is thus nothing unfair about requiring the defendant to pay over this 'profit' in the form of interest to the plaintiff, the party who was entitled to the funds from the date the defendant's liability was fixed."). Thus, because prejudgment interest is mandatory, this Court applies the substantive law of New York. *U.S. Naval Inst.*, 936 F.2d at 698; *see also Harris v. Mickel*, 15 F.3d 428, 429 (5th Cir. 1994) (applying New York prejudgment interest in a diversity case).

Prejudgment interest accrues from "the earliest ascertainable date" the cause of action existed. N.Y. C.P.L.R. § 5001(b); *Brushton-Moira*, 91 N.Y.2d at 262 (modifying lower court award of prejudgment interest from the trial date to the date claim accrued); *Halsey v. Connor*, 731 N.Y.S.2d 760, 761 (2d Dep't 2001) (ordering a new trial to recalculate prejudgment interest from date cause of action accrued and not trial date). When damages are incurred on different dates, § 5001(b) provides some flexibility. But that flexibility does not apply here because the breach under § 2.18(c) occurred on a single date: the closing of the 2020 Transaction.

The Participating Lenders argue that it would be inequitable to award prejudgment interest at 9.00% from the closing date of the 2020 Transaction to the judgment date. They note that New York has one of the higher prejudgment interest rates in the country. And that the Excluded Lenders unsuccessfully tried to enjoin the 2020 Transaction from closing in New York state court, dismissed their lawsuits, and started another lawsuit two years later. The Participating Lenders say this shows parties sat on their rights. The Participating Lenders also note they initially won before the bankruptcy court and were later reversed. All this to say that 9.00% interest on a multi-hundred million damages claim over 6 years is a big number. The Court understands these arguments, but that doesn't change the answer here. Equitable considerations don't come into play in this breach of contract case because prejudgment interest is mandatory.[216]

Cases the Participating Lenders rely on don't help either. They all involve either federal law claims or non-New York state law claims where no mandatory New York interest provision applied. *See In re Borschow*, 454 B.R. 374, 403 (Bankr. W.D. Tex. 2011) (Texas and federal law in a chapter 7 section 523 action); *In re Loggins*, 513 B.R. 682, 715 n.104 (Bankr. E.D. Tex. 2014) (Texas and federal law in a chapter 7 fraudulent transfer/preference action); *In re Process Prop. Corp.*, 327 B.R. 603, 609–10 (Bankr. N.D. Tex. 2005) (interest rate for oversecured lienholder under Bankruptcy Code § 506(b)); *Perez v. Bruister*, 823 F.3d 250, 274 (5th Cir. 2016) (ERISA); *Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1289 n.20 (5th Cir. 1994) (federal labor law). They are all inapplicable.

---

[216] Regardless, this Court wouldn't apply any form of equity here anyway based on the record.

The *Brushton-Moira* case, however, demonstrates how strictly New York's highest court applies § 5001. In that case the plaintiff alleged a breach of contract that occurred in 1982. The defendant won at trial. An appellate court later reversed and remanded for a damages trial on plaintiff's breach of contract claim. After trial, the lower court set prejudgment interest from October 1995, which was the damages trial date. The plaintiff appealed again. The NY Court of Appeals ultimately held that prejudgment interest should be calculated as of the breach date. Thus, prejudgment interest ran from the 1982 breach date to 1995—across thirteen years and multiple appeals. At the time of judgment in the lower court, prejudgment interest award was calculated at $417,785, which exceeded the damages award of $338,521. *Brushton-Moira*, 91 N.Y.2d at 260.

*O'keefe v. Barra* is also instructive. 186 N.Y.S.3d 717, 720–21 (3d Dep't 2023). In that case, an appellate court reversed a lower court, holding that a lawyer was entitled to prejudgment interest in a breach of contract claim against a former client for not paying legal fees. The lower court faulted the plaintiff for waiting five years to bring the breach of contract action. But the appellate court disagreed and held that "the responsibility for the delay [in bringing suit] should not be a controlling factor in deciding whether interest is to be computed" under § 5001(b). *Id*. (quoting *Love v. State*, 577 N.Y.S.2d 359).

The New York Court of Appeals has enforced 9.00%. *Brushton-Moira*, 91 N.Y.2d at 262; *Spodek*, 733 N.Y.S.2d at 675–76. This Court will not substitute the parties' decision to have New York law govern disputes about the Credit Agreement without any applicable exceptions. Plaintiffs are awarded prejudgment interest at 9.00% per annum from June 22, 2020 through July 7, 2026.

### Judgment and Several Liability

Under the Credit Agreement, the obligations of lenders are several and not joint.[217] That means each Defendant is liable for its own proportionate several share of the total damages award, and not for a portion attributable to a Defendant who has settled, been dismissed, or is otherwise no longer a party to this litigation.[218] Liability does not increase for a Defendant because other Defendants are no longer in this case.

The total damages award is $261.13 million, subject to the following adjustments on the Plaintiffs' side. First, the portion of $261.13 million attributable to any Excluded Lender or LCM Lender that is no longer a Plaintiff is excluded from the recoverable amount.[219] Second, Apollo's recovery as a Plaintiff is limited to

---

[217] Credit Agreement § 9.15, Debtors' Ex. 6, Case No. 23-90020, ECF No. 853-6.

[218] There are many Defendants that are no longer Defendants through settlement or otherwise. *See, e.g.*, Adv. ECF Nos. 471, 514, 732, 738, 739, 741.

[219] For example, Ascribe III Investments, LLC is no longer a plaintiff. *See* Adv. ECF No. 708.

47 / 48

damages calculated based on 50% of its holdings, consistent with the Court's ruling on a motion in limine.[220]

Each Defendant's remaining portion of the adjusted damages total is calculated by that Defendant's individual First Lien Term Loan holdings as of June 22, 2020, expressed as a fraction of the total First Lien Term Loan holdings of all Participating Lenders at that time, applied to the adjusted damages figure. Prejudgment interest at 9.00% per annum accrues on each remaining Defendant's individual several damages from June 22, 2020 through July 7, 2026.

The Plaintiffs are instructed to submit a proposed form of final judgment consistent with this Memorandum Opinion. The proposed judgment must identify each remaining Defendant, the face value of its First Lien Term Loan holdings as of June 22, 2020, its proportionate several share of the adjusted damages total, and the prejudgment interest accrued on that share through July 7, 2026.

Signed:  July 07, 2026

_____
Christopher Lopez
United States Bankruptcy Judge

---

[220] The Court stands by its ruling and adds that it is separately warranted because it follows a May 2023 stipulation and agreed order providing that 50% of applicable purchases at issue would be "deemed null and void." Stipulation and Agreed Order, Adv. ECF No. 290.

48 / 48